

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HARRY PLOSS, Individually and On Behalf )
of All Others Similarly Situated, )

CIVIL ACTION NO. 07 CV 10937 (SWK)

Plaintiff, )

vs. )

BANKATLANTIC BANCORP, INC., )
JAMES A. WHITE, VALERIE C. )
TOALSON, JARETT S. LEVAN and ALAN )
B. LEVAN, )

CLASS ACTION COMPLAINT

RECEIVED
OCT 09 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Defendants. )

**JURY TRIAL DEMANDED**

---

Plaintiff, Harry Ploss ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BankAtlantic Bancorp, Inc. ("BankAtlantic" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal class action on behalf of purchasers of BankAtlantic's securities between November 9, 2005 and October 25, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     BankAtlantic is a financial services holding company that, through its subsidiaries, provides a full line of products and services encompassing consumer and commercial banking. The Company's subsidiaries provide traditional retail banking services, and a range of commercial banking products and related financial services through a network of more than 90 branches.

3.     On October 25, 2007, the Company shocked investors when it reported its third quarter 2007 financial and operational results. For the quarter, the Company announced a net loss of $29.6 million, or ($0.52) per diluted share, as compared to net income of $2.5 million, or $0.04 per diluted share, for the third quarter of 2006. Additionally, the Company disclosed that its non-performing loans had increased from $21.8 million at June 30, 2007 to $165.4 million at September 30, 2007, and that its loss experience for the quarter was a net charge-off of $11.3 million, as compared to a net recovery of $0.2 million for the quarter ended September 30, 2006. Included in the $11.3 million net charge-off was $8.8 million related to the write-down of one "builder land bank loan."

4.     On this news, the Company's shares fell $2.93 per share, or over 38.3 percent, to close on October 26, 2007 at $4.72 per share, on unusually heavy trading volume.

5.     The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company had granted a $27 million loan without having obtained an adequate appraisal of the underlying collateral; (2) that the Company had failed to properly classify this under-collateralized $27 million loan as an impaired loan; (3) that the Company's exposure to "at-risk" loans was significantly understated; (4) that the Company had significantly under-reserved for

2

loan losses in its portfolio, which had the effect of understating the Company's loan loss reserves and overstating its net income; (5) that the Company had deferred the recognition of losses associated with certain non-accrual loans rather than taking timely writedowns on such loans; (6) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times; (7) that the defendants had failed to comply with the Company's policies relating to collateral based lending, underwriting and risk management; (8) that the Company lacked adequate internal and financial controls; and (9) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

6.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  BankAtlantic's securities are listed on the New York Stock Exchange ("NYSE") and are actively traded in this Judicial District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

3

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.    Plaintiff, Harry Ploss, as set forth in the accompanying certification, incorporated by reference herein, purchased BankAtlantic's securities at artificially inflated prices during the Class Period and has been damaged thereby.

12.    Defendant BankAtlantic maintains its executive offices at 2100 West Cypress Creek Road, Fort Lauderdale, Florida.

13.    Defendant James A. White ("White") was, at relevant times, the Company's Chief Financial Officer ("CFO") and Executive Vice President.

14.    Defendant Valerie C. Toalson ("Toalson") was, at relevant times, the Company's CFO and Executive Vice President.

15.    Defendant Jarett S. Levan ("J. Levan") was, at relevant times, the Company's President.

16.    Defendant Alan B. Levan ("A. Levan") was, at relevant times, the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.

17.    Defendants White, Toalson, J. Levan and A. Levan are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BankAtlantic's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or

4

cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

18.    BankAtlantic is a financial services holding company that, through its subsidiaries, provides a full line of products and services encompassing consumer and commercial banking. The Company's subsidiaries provide traditional retail banking services, and a range of commercial banking products and related financial services through a network of more than 90 branches.

19.    On October 19, 2005, the Company issued a press release announcing its third quarter 2005 financial and operational results. The Company reported that its net income had increased 10.9 percent to $16.3 million for the quarter, and had increased 13.5 percent to $60.7 million year-to-date. Diluted earnings per share were $0.26 for the quarter, up 13 percent, and $0.95 year-to-date, up 13.1 percent. Additionally, the Company reported that credit quality "remained strong in the third quarter, with net recoveries in the period of $455,000 compared to net charge-offs of $212,000 for the immediately preceding quarter. On a year-to-date basis, the Bank had net recoveries of $1.2 million." For the quarter, the Company recorded a negative provision for loan losses of $3.4 million, with the year-to-date expense of a negative $6.5 million

against a negative provision of $1.1 million in the same period of 2004. Also, the Company reported that the ratio of the allowance for loan losses to non-performing loans "remained high," closing the quarter at 591 percent.

## Materially False and Misleading
## Statements Issued During the Class Period

20.    The Class Period begins on November 9, 2005. On this day, the Company filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants A. Levan and White, and reaffirmed the Company's financial results previously announced on October 19, 2005. Additionally, the Company, in relevant part, stated:

**For the Three Months Ended September 30, 2005 Compared to the Same 2004 Period:**

Charge-offs and recoveries from continuing loan products were nominal for the three months ended September 30, 2005 and 2004. The lower charge-offs and recoveries from discontinued loan products resulted from declining portfolio balances. The majority of the discontinued loan products charge-offs and recoveries related to lease finance lending. Outstanding balances of this product have declined from $8.6 million at September 30, 2004 to $1.7 million at September 30, 2005.

*The recovery for loan losses during the current quarter was due to decreased reserves in the commercial loan portfolio reflecting lower loan balances and a payoff of a large hotel loan.* Loans to borrowers in the hospitality industry are allocated higher general reserves than other categories of loans in the portfolio.

The provision for loan losses during the 2004 quarter resulted from additional reserves allocated to a $17.7 million hotel loan in which the financial condition of the borrower deteriorated during the quarter.

* * *

*BankAtlantic's allowance for loan losses was 0.89% and 1.17% of total loans at September 30, 2005 and 2004, respectively. The declining trend in the allowance to loan ratio reflects recent historically low charge-off experience, and a change in the mix*

6

*of the loan portfolio from commercial to residential loans and the run-off of our "discontinued loan products".* Residential loans are assigned a substantially lower general reserve than discontinued and commercial loans. [Emphasis added.]

21.     The Company's 10-Q filed on November 9, 2005 also contained Sarbanes-Oxley required certifications, signed by Defendants Levan and Which, who stated:

I, [Alan B. Levan and James A. White], certify that:

1.     I have reviewed this quarterly report on Form 10-Q of BankAtlantic Bancorp, Inc.;

2.     Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.     Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b.     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial

statements for external purposes in accordance with generally accepted accounting principles;

   c.   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation;

   d.   disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   a.   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\* \* \*

In connection with the Quarterly Report of BankAtlantic Bancorp, Inc. (the "Company") on Form 10-Q for the period ended September 30, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, [Alan B. Levan, Chief Executive Officer and James A. White, Chief Financial Officer] of the Company, certify, pursuant to 18 U.S.C. $1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1)   the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

8

2)   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

22.   On January 25, 2006, the Company issued a press release entitled "BankAtlantic Bancorp Reports Earnings For The Fourth Quarter and Full Year 2005; Fourth Quarter Includes $10 Million Charge for Compliance Matter." Therein, the Company, in relevant part, stated:

> BankAtlantic Bancorp, Inc. (NYSE:BBX), the parent company of BankAtlantic and Ryan Beck & Co., today reported net income was $59.1 million, or $0.92 per diluted share, for the year ended December 31, 2005, compared to $70.8 million, or $1.11 per diluted share, reported in 2004. For the fourth quarter 2005, a net loss of ($1.6) million was recorded, equivalent to ($0.03) per diluted share, compared to earnings of $17.3 million, or $0.27 per diluted share, for the fourth quarter, 2004.

> * * *

> "Credit quality remained strong in the fourth quarter, with total non-performing loans declining to $6.8 million at December 31, 2005 compared to $7.9 million at December 31, 2004 and relatively flat compared to the $6.9 million level at September 30, 2005. The ratio of non-performing loans to total loans declined to 0.15% at December 31, 2005 from 0.17% at December 31, 2004. In 2005, the Bank continued to experience net recoveries - which totaled $606,000 for the fourth quarter and $1.8 million for the year. As a result, negative provisions of $109,000 and $6.6 million were recorded for the quarter and year, respectively. Most significantly, our coverage of non-performing loans remained extremely high, with the ratio of the allowance for loan losses to non-performing loans at 606% at December 31, 2005.

23.   On March 16, 2006, BankAtlantic filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by Defendants A. Levan, White, and J. Levan, and reaffirmed the Company's financial results previously announced on January 25, 2006. The Company's 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶21, *supra*. Additionally, the Company, in relevant part, stated:

> During 2005, our provision was a recovery due to decreased reserves associated with the commercial loan portfolio reflecting

lower loan balances and a payoff of a large hotel loan. Loans to borrowers in the hospitality industry are allocated higher general reserves than other categories of loans in the portfolio. We also experienced a reduction in our classified loans during the year which further added to our recovery from loan losses.

\* \* \*

Management believes that the allowance for loan losses reflects management's best estimate of incurred credit losses as of the statement of financial condition date. As of December 31, 2005, our allowance for loan losses was $41 million.

\* \* \*

We periodically analyze our loan portfolio by monitoring the loan mix, credit quality, historical trends and economic conditions. As a consequence, our allowance for loan losses estimates will change from period to period. A portion of the change in our loan loss estimates during the five year period ended December 31, 2005 resulted from changes in credit policies which focused our loan production on collateral based loans and the discontinuation of certain loan products.

\* \* \*

BankAtlantic evaluates the collectibility of its loan portfolio and provides an allowance for loan losses that it believes is adequate based upon such factors as:

- the risk characteristics of various classifications of loans;

- previous loan loss experience;

- specific loans that have loss potential;

- delinquency trends;

- estimated fair value of the collateral;

- current economic conditions;

- the views of its regulators; and

- geographic and industry loan concentrations.

\* \* \*

10

The majority of BankAtlantic's loan portfolio consists of loans secured by real estate. BankAtlantic's loan portfolio included $2.0 billion of loans secured by residential real estate and $2.4 billion of commercial real estate, construction and development loans at December 31, 2005. At December 31, 2005, BankAtlantic's commercial real estate, construction and development loans, which are concentrated mainly in South Florida, represented approximately 45.2% of its loan portfolio. Accordingly, declines in real estate values, particularly in South Florida, could have a material adverse impact on the credit quality of BankAtlantic's loan portfolio and on its results. Real estate values are affected by various factors, including changes in general and/or regional economic conditions, governmental rules and policies and natural disasters such as hurricanes.

BankAtlantic's commercial real estate loan portfolio includes large lending relationships, including relationships with unaffiliated borrowers involving lending commitments in each case in excess of $30 million. These relationships represented an aggregate outstanding balance of $633 million as of December 31, 2005. Defaults by any of these borrowers could have a material adverse effect on BankAtlantic's results.

\* \* \*

The calculation of our allowance for loan losses consists of three components. The first component requires us to identify impaired loans based on management classification and, if necessary, assign a valuation allowance to the impaired loans. Valuation allowances are established using management estimates of the fair value of collateral and based on valuation models that present value estimated expected future cash flows. These valuations are based on available information and require estimates and subjective judgments about fair values of the collateral or expected future cash flows. Most of our loans do not have an observable market price and an estimate of the collection of contractual cash flows is based on the judgment of management. It is likely that we would obtain materially different results if different assumptions or conditions were to prevail. This would include updated information that came to management's attention about the loans or a change in the current economic environment. As a consequence of the estimates and assumptions required to calculate the first component of our allowance for loan losses, a change in these highly uncertain estimates could have a materially favorable or unfavorable impact on our financial condition and results of operations.

The second component of the allowance requires us to group loans that have similar credit risk characteristics so as to form a basis for predicting losses based on loss percentages and delinquency trends as it relates to the group. Management assigns an allowance to these groups of loans by utilizing data such as historical loss experiences, loan-to-value ratios, concentration of credit risk, and delinquency trends. Management uses significant judgment to qualitatively adjust the historical loss experiences for current trends that existed at period end that were not reflected in the calculated historical loss ratios. A subsequent change in data trends may result in material changes in this component of the allowance from period to period.

The third component of the allowance is the unassigned portion of the allowance. This component addresses certain industry and geographic concentrations, the view of regulators, model imprecision, change in underwriting standards and changes in the composition of the loan portfolio. This component requires substantial management judgment in adjusting the allowance for the changes in the current economic climate compared to the economic environment that existed historically. Due to the subjectivity involved in the determination of the unassigned portion of the allowance, the relationship of the unassigned component to the total allowance may fluctuate substantially from period to period.

24.    On April 26, 2006, the Company issued a press release entitled "BankAtlantic Bancorp Reports Financial Results for First Quarter 2006; Confirms Resolution of Compliance Matter." Therein, the Company, in relevant part, stated:

BankAtlantic Bancorp, Inc. (NYSE:BBX) ("Company") today announced financial results for the quarter ended March 31, 2006. Net income was $6.7 million, or $0.11 per diluted share, compared to $19.9 million, or $0.31 per diluted share, reported in the first quarter 2005.

Alan B. Levan, Chairman and Chief Executive Officer of BankAtlantic Bancorp commented, "The quarter's financial results reflect our earlier decision to forego near-term results due to the previously announced costs of our expanded marketing program, our new store expansion program, and the added costs of our expanded hours 'convenience model.' We earlier announced our decision to increase our marketing expenditures by approximately $5 million each quarter and to move forward with a new store program with a goal of building sustainable high levels of low cost

deposits (demand, savings, and NOW accounts). We knew that
these incremental costs would cause earnings for several quarters
to be below those of prior periods and our long term objectives, but
we expect these moves, in turn, to translate into superior long term
profitability. Based on the first quarter's results, we believe our
strategy is working. BankAtlantic's growth in new low-cost
deposits continued to be among the highest rates in the industry,
even in the face of general national declines in these deposits.
Additionally, earning asset levels remained steady, consistent with
our current posture in response to interest rates. We are extremely
pleased that asset quality remained very high and that our bank's
other growth initiatives are moving forward as anticipated.

* * *

"Earnings for BankAtlantic for the quarter were $10.4 million,
down from $20.9 million in the first quarter of 2005. Net interest
income of $55.1 million was $0.8 million greater than the first
quarter of 2005, in spite of declines in earning assets, reflecting our
strategy of utilizing the growth of lower cost deposits to reduce
borrowings instead of investing in earning assets. The ratio of
borrowings to deposits and borrowings at quarter end had
improved to 26%, down from 35% in the first quarter of 2005. Our
longer term expectation is for this ratio to trend toward a range of
10-15%.

* * *

"Credit quality remained strong, with the ratio of non-performing
loans to total loans at 0.14% at March 31, 2006. During the
quarter, BankAtlantic recorded net recoveries of $534,000,
continuing the pattern of the past several quarters. Provision
expense was $163,000 compared to a negative provision of
$109,000 in the quarter ended December 31, 2005 and a negative
provision of $3.9 million in the corresponding quarter of 2005. The
ratio of the allowance for loan losses to non-performing loans
remained solid, closing the quarter at 687% compared to 606% at
December 31, 2005, and 662% at March 31, 2005.

    25.    On May 10, 2006, BankAtlantic filed its Quarterly Report with the SEC on Form

10-Q. The Company's 10-Q was signed by Defendants A. Levan and White, and reaffirmed the

Company's financial results previously announced on April 26, 2006. The Company's 10-Q also

contained Sarbanes-Oxley required certifications, substantially similar to the certifications

contained in ¶21, *supra*. Additionally, the Company, in relevant part, stated:

> ***Allowance for Loan Losses*** - The allowance for loan losses reflects management's estimate of probable incurred credit losses in the loan portfolios. Loans are charged off against the allowance when management believes the loan is not collectible. Recoveries are credited to the allowance.
>
> The allowance consists of two components. The first component of the allowance is for high-balance "non-homogenous" loans that are individually evaluated for impairment. The process for identifying loans to be evaluated individually for impairment is based on management's identification of classified loans. Once an individual loan is found to be impaired, a valuation allowance is assigned to the loan based on one of the following three methods: (1) present value of expected future cash flows, (2) fair value of collateral less costs to sell, or (3) observable market price. Non-homogenous loans that are not impaired are assigned an allowance based on common characteristics with homogenous loans.
>
> The second component of the allowance is for "homogenous loans" in which groups of loans with common characteristics are evaluated to estimate the inherent losses in the portfolio. Homogenous loans have certain characteristics that are common to the entire portfolio so as to form a basis for predicting losses as it relates to the group. Management segregates homogenous loans into groups such as residential real estate, small business mortgage, small business non-mortgage, low-balance commercial loans and various types of consumer loans. The allowance for homogenous loans has a quantitative amount and a qualitative amount. The methodology for the quantitative component is based on a three year charge-off history by loan type adjusted by an expected recovery rate. A three year period was considered a reasonable time frame to track a loan's performance from the event of loss through the recovery period. The methodology for the qualitative component is determined by considering the following factors:
>
> - Delinquency and charge-off levels and trends;
>
> - Problem loans and non-accrual levels and trends;
>
> - Lending policy and underwriting procedures;
>
> - Lending management and staff;
>
> - Nature and volume of portfolio;

- Economic and business conditions;

- Concentration of credit;

- Quality of loan review system; and

- External factors

Based on an analysis of the above factors a qualitative dollar amount is assigned to each homogenous loan product. These dollar amounts are adjusted, if necessary, at period end based on directional adjustments by each category.

The unassigned component that was part of the Company's allowance for loan losses in prior periods was calculated based on the entire loan portfolio considering the above factors and was incorporated into the qualitative components of homogenous loans described above.

26.    On July 19, 2006, the Company issued a press release entitled "BankAtlantic Bancorp Reports Financial Results for the Second Quarter 2006." Therein, the Company, in relevant part, stated:

BankAtlantic Bancorp, Inc. (NYSE:BBX) today announced financial results for the second quarter 2006. For the three-month period ending June 30, 2006, net income was $8.4 million, or $0.13 per diluted share, compared to $24.5 million, or $0.38 per diluted share, reported in the second quarter 2005. Year-to-date, net income was $15.1 million, or $0.24 per diluted share, compared to $44.4 million, or $0.69 per diluted share, for the first six months of 2005.

Alan B. Levan, Chairman and Chief Executive Officer of BankAtlantic Bancorp commented, "In BankAtlantic, the second quarter's results are consistent with our long term strategy of growing our banking franchise, and with our focus on long term returns rather than short-term earnings. The quarter's performance also reflects the impact of a $2.1 million loss at Ryan Beck, discussed in detail later in this release, compared to a $13.0 million profit for the corresponding 2005 quarter.

\* \* \*

"For the second quarter 2006, net income for BankAtlantic was $12.8 million, down from $14.8 million in the comparable 2005

15

period. Net interest income for the second quarter 2006 was $55.3 million, or $0.8 million lower than the 2005 quarter, due to lower earning assets, which more than offset an improved margin. We have continued our strategy of using the growth in low cost deposits to reduce borrowings, and as a result, the ratio of borrowings to total deposits and borrowings at quarter end improved to 29%, down from 38% in the second quarter of 2005, although up slightly from the immediately preceding quarter. Our longer term expectation is for this ratio to trend toward the 10-15% range.

\* \* \*

"Credit quality remained good during the second quarter, with the ratio of non-performing loans to total loans decreasing from 0.14% three months ago to 0.12% at June 30, 2006. The ratio of non-performing assets to total loans plus other real estate also declined modestly during the same period to 0.17%. The allowance for loan losses (ALL) was unchanged from the March 2006 quarter, remaining at $42 million.

27.     On August 9, 2006, BankAtlantic filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants A. Levan and White, and reaffirmed the Company's financial results previously announced on July 19, 2006. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶21, *supra*. Additionally, the Company, in relevant part, stated:

> ***Allowance for Loan Losses*** - The allowance for loan losses reflects management's estimate of probable incurred credit losses in the loan portfolios. Loans are charged off against the allowance when management believes the loan is not collectible. Recoveries are credited to the allowance.
>
> The allowance consists of two components. The first component of the allowance is for high-balance "non-homogenous" loans that are individually evaluated for impairment. The process for identifying loans to be evaluated individually for impairment is based on management's identification of classified loans. Once an individual loan is found to be impaired, a valuation allowance is assigned to the loan based on one of the following three methods: (1) present value of expected future cash flows, (2) fair value of collateral less costs to sell, or (3) observable market price. Non-homogenous

loans that are not impaired are assigned an allowance based on common characteristics with homogenous loans.

The second component of the allowance is for "homogenous loans" in which groups of loans with common characteristics are evaluated to estimate the inherent losses in the portfolio. Homogenous loans have certain characteristics that are common to the entire portfolio so as to form a basis for estimating losses as it relates to the group. Management segregates homogenous loans into groups such as residential real estate, small business mortgage, small business non-mortgage, low-balance commercial loans, certain unimpaired non-homogenous loans and various types of consumer loans. The allowance for homogenous loans has a quantitative amount and a qualitative amount. The methodology for the quantitative component is based on a three year charge-off history by loan type adjusted by an expected recovery rate. A three year period was considered a reasonable time frame to track a loan's performance from the event of loss through the recovery period. The methodology for the qualitative component is determined by considering the following factors:

- Delinquency and charge-off levels and trends;

- Problem loans and non-accrual levels and trends;

- Lending policy and underwriting procedures;

- Lending management and staff;

- Nature and volume of portfolio;

- Economic and business conditions;

- Concentration of credit;

- Quality of loan review system; and

- External factors

Based on an analysis of the above factors a qualitative dollar amount is assigned to each homogenous loan product. These dollar amounts are adjusted, if necessary, at period end based on directional adjustments by each category.

The unassigned component that was part of the Company's allowance for loan losses in prior periods was calculated based on the entire loan portfolio considering the above factors and was

17

incorporated into the qualitative components of homogenous loans described above.

28.     On October 18, 2006, the Company issued a press release entitled "BankAtlantic Bancorp Reports Financial Results for the Third Quarter 2006." Therein, the Company, in relevant part, stated:

> BankAtlantic Bancorp, Inc. (NYSE:BBX) today announced financial results for the third quarter 2006. For the three-month period ending September 30, 2006, net income was $2.3 million, or $0.04 per diluted share, compared to $16.3 million, or $0.26 per diluted share, for the third quarter 2005. Year-to-date, net income was $17.2 million, or $0.27 per diluted share, compared to $60.7 million, or $0.95 per diluted share, for the nine months of 2005.
>
> Alan B. Levan, Chairman and Chief Executive Officer of BankAtlantic Bancorp commented, "This quarter's performance reflects a $4.8 million loss at Ryan Beck for the quarter (or approximately $0.08 per diluted share), slower net growth in low cost deposits at BankAtlantic (although we continue to achieve increases in new accounts and balances associated with those accounts), and several other factors discussed in this release. Despite the quarter's results, we remain committed to our banking strategy, and are pleased with the underlying growth in new account openings and growth in fee revenue at BankAtlantic. Also discussed later in this release, Ryan Beck is undertaking a review of its operations with a view toward improving its future performance.
>
> * * *
>
> ***"For the third quarter 2006, BankAtlantic's net income was $9.7 million, down from $19.3 million in the comparable 2005 quarter. The third quarter 2005 included a negative provision for loan losses of $3.4 million, compared to a $271,000 provision in the current quarter, contributing significantly to the earnings decline.*** Additionally, the current quarter reflects relatively flat net interest income and increased expenses associated with our new store expansion program and its related marketing costs, partially offset by growth in fee income.
>
> * * *
>
> "Credit quality remained good in the third quarter, with the ratio of non-performing loans to total loans increasing only slightly from

18

0.12% at June 30, 2006 to 0.13% at September 30, 2006, and the ratio of non-performing assets to total loans plus other assets remaining stable at 0.17%. The Bank recorded a net recovery of $234,000 in the third quarter compared to a net recovery of $143,000 for the immediately preceding quarter. Year-to-date, the Bank has experienced net recoveries of $911,000. The Allowance for Loan Losses increased slightly from $42.0 million at June 30, 2006 to $42.5 million at September 30, 2006, and the ratio of the allowance to non-performing loans at quarter end was 674%. [Emphasis added.]

29.    On November 8, 2006, BankAtlantic filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Defendants A. Levan and White, and reaffirmed the Company's financial results previously announced on October 18, 2006.  The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶21, *supra*.  Additionally, the Company, in relevant part, stated:

*Allowance for Loan Losses* - The allowance for loan losses reflects management's estimate of probable incurred credit losses in the loan portfolios. Loans are charged off against the allowance when management believes the loan is not collectible. Recoveries are credited to the allowance.

The allowance consists of two components. The first component of the allowance is for high-balance "non-homogenous" loans that are individually evaluated for impairment. The process for identifying loans to be evaluated individually for impairment is based on management's identification of classified loans. Once an individual loan is found to be impaired, a valuation allowance is assigned to the loan based on one of the following three methods: (1) present value of expected future cash flows, (2) fair value of collateral less costs to sell, or (3) observable market price. Non-homogenous loans that are not impaired are assigned an allowance based on common characteristics with homogenous loans.

The second component of the allowance is for "homogenous loans" in which groups of loans with common characteristics are evaluated to estimate the inherent losses in the portfolio. Homogenous loans have certain characteristics that are common to the entire portfolio so as to form a basis for estimating losses as it relates to the group. Management segregates homogenous loans into groups such as residential real estate, small business mortgage, small business non-mortgage, low-balance commercial loans,

certain unimpaired non-homogenous loans and various types of consumer loans. The allowance for homogenous loans has a quantitative amount and a qualitative amount. The methodology for the quantitative component is based on a three year charge-off history by loan type adjusted by an expected recovery rate. A three year period was considered a reasonable time frame to track a loan's performance from the event of loss through the recovery period. The methodology for the qualitative component is determined by considering the following factors:

- Delinquency and charge-off levels and trends;

- Problem loans and non-accrual levels and trends;

- Lending policy and underwriting procedures;

- Lending management and staff;

- Nature and volume of portfolio;

- Economic and business conditions;

- Concentration of credit;

- Quality of loan review system; and

- External factors

Based on an analysis of the above factors a qualitative dollar amount is assigned to each homogenous loan product. These dollar amounts are adjusted, if necessary, at period end based on directional adjustments by each category.

The unassigned component that was part of the Company's allowance for loan losses in prior periods was calculated based on the entire loan portfolio considering the above factors and was incorporated into the qualitative components of homogenous loans described above.

30. On January 31, 2007, the Company issued a press release entitled "BankAtlantic Bancorp Reports Earnings For The Fourth Quarter and Full Year, 2006." Therein, the Company, in relevant part, stated:

BankAtlantic Bancorp, Inc. (NYSE:BBX), today reported income from continuing operations of $26.9 million, or $0.43 per diluted

share, for the year ended December 31, 2006, compared to $42.5 million, or $0.67 per diluted share, reported for the year ended December 31, 2005. For the fourth quarter 2006, income from continuing operations was $1.0 million, or $0.02 per diluted share, compared to a loss of ($2.2) million, or ($0.04) per diluted share, for the fourth quarter, 2005. (On January 9, 2007, BankAtlantic Bancorp announced that it had signed a definitive agreement for the sale of Ryan Beck Holdings, Inc. ("Ryan Beck") to Stifel Financial. Accordingly, Ryan Beck's financial results are classified as discontinued operations effective in the fourth quarter, 2006. Additional information on this pending sale is contained later in this release.)

BankAtlantic Bancorp's Chairman and Chief Executive Officer, Alan B. Levan, commented, "The financial results for the fourth quarter and full year 2006 reflect a challenging environment for gathering core deposits, the foreclosure on one large real estate credit, and the costs of our continued commitment to our new store expansion program. We continue to view this new store expansion program as being crucial to our building sustainable growth in core deposits (Demand, NOW and Savings accounts), and to maintaining our focus on building long-term franchise and shareholder value.

"We are assessing all aspects of our approach to sales and marketing, and have commenced initiatives to reduce overall expenses without impacting our customer service and growth initiatives. Additionally, we have included in the release detailed information on the performance of the store expansion program to support the basis for our belief that this is the correct strategic action for BankAtlantic," Levan concluded.

\* \* \*

Net Income for the fourth quarter 2006 was $3.6 million, up from $0.9 million in the comparable 2005 quarter. *The fourth quarter 2006 included an $8.2 million provision for loan losses vs. a $0.1 million recovery in the comparable 2005 quarter, and a $1.0 million reduction in the provision for income taxes due to a lower annual effective tax rate.*

\* \* \*

*Credit Quality -- During the fourth quarter 2006, the Bank took possession of the real estate securing the $27.2 million non-performing loan disclosed in the Company's third quarter Form 10-Q filing. The loan was charged down by $7.0 million to its*

*collateral value less costs to sell and transferred to Real Estate Owned (REO) with a corresponding increase in the provision for loan losses of the same amount.*

As a result, the ratio of non-performing loans to total loans decreased from 0.70% at September 30, 2006 to 0.10% at December 31, 2006. Including the effect of this one loan, the ratio of annualized net charge-offs to average loans rose to 0.61% for the fourth quarter 2006 and 0.13% for the full year. The ratio of non-performing assets to total loans and real estate owned decreased from 0.72% at September 30, 2006 to 0.55% at December 31, 2006. Fourth quarter 2006 provision expense was $8.2 million representing 0.70% of average loans vs. 0.02% of average loans for the third quarter 2006. On a full year basis, provision expense for 2006 was $8.6 million, or 0.19% of average loans vs. a negative provision of ($6.6) million or (0.14%) of average loans for 2005.

*Alan Levan commented, "We are very aware of concerns at the national level and within Florida about the condition of the real estate market, and are closely watching these conditions in our markets and the potential impact on our loan portfolio. We believe that our credit process has remained conservative and consistent with our practices over the past several years during which our credit experience was excellent.* That being said, we are monitoring our real estate exposure with the utmost of caution and attention to the current market trends." [Emphasis added.]

31.    On February 1, 2007, BankAtlantic held an earnings conference call with investors and financial analysts.  During this call, Defendants White and J. Levan, in relevant part, stated:

JIM WHITE: On the credit front last quarter we released our earnings and then encountered a situation involving a $27 million land development loan that we placed on non-accrual prior to the time that we filed the 10-Q. *We obtained an appraisal in the fourth quarter and charged that down to about $20 million which is what we believe the net realizable value including the cost to complete the development. The development is largely complete.* The restorative provision we had to make of $7 million was $0.07 a share in itself, but really only brought our credit losses for the year to a level that we had in the budget for the entire year and very much in line with the 10 to 15 basis points we've said that we anticipated our long-term credit loss average would be following two years with really very superior results.

* * *

[ANALYST]: ... And then just a question here on credit, kind of a two-prong question. If we take your loan loss provision and we strip out the $7 million CRE charge off, and I assume that was all related to that one commercial real estate property.

JIM WHITE: Yes.

[ANALYST]: Then it gives us a loan loss provision of 1.16 million. Is that a good going-forward quarterly run rate in this environment?

JIM WHITE: Laurie, I would fall back to what we've consistently said. You ought to expect 10 to 15 basis points annualized rate.

[ANALYST]: Okay.

JARETT LEVAN: And also while *we believe that we are very conservative in our underwriting and that our portfolio is high quality*, we're going to be subject to the vagaries of the Florida market. So if the Florida market starts to deteriorate, even though we feel very good about our portfolio -- our portfolio is going to deteriorate as well. It is just the natural evolution of the way it works.

[ANALYST]: Right. And actually I wonder, can you just expand a little bit, just generally, on your commercial portfolio and then maybe just as a last point just touch on that CRE loan which I guess now has a balance just under 20 million, if you could update us on where that is? I know it is in foreclosure but what your anticipated time line on resolution, what else we could see, what else he should with be watching for? And just generally on the commercial side what specifically is out there of concern?

JARETT LEVAN: First of all, it actually didn't go into foreclosure. It is really form over substance here. We took a deed in lieu of foreclosure, so we own that in our portfolio today. We did not go through a judicial foreclosure. The borrower deeded it to us rather than going through a foreclosure. *At this point we are working on just completing some of the site work that's required, and we are investigating doing a number of things with the property to liquidate it. We're working with the potential buyers, brokers, auctioneers, et cetera. It is not our intention to hold the property long-term.* It is just really a question of what the market will bear. We've not tested the market yet, so we just don't know, and of course when you appraise a property, I don't have good detail for you, but *when you appraise a property for liquidation, the*

> *appraiser goes through a process of an assumed absorption, an assumed sale at which, my guess is several years in order to liquidate the property, and then you bring it back to current value.* So to the extent that we could liquidate it faster rather than later, then the net proceeds will be higher than the number that we've written it down to. On the other hand, obviously if it takes longer then that number it won't be a good number, so it is still too early for to us really give you any good data on that disposition.
>
> [ANALYST]: Can you just give us a quick description of the property again so we have that?
>
> JARETT LEVAN: It is a large track. It is about 20 miles from Sarasota. It is an equestrian type of property with five acre pods. It is nicely designed. One of the ways to market this property is we are reaching out to, nationally to those kinds of buyers who would be interested in this kind of a property, and we've gotten some interest in inquiries, but the property is in a reasonable market it is a very, very high quality piece of property, and it is well designed. In this kind of a market, clearly it becomes something different.
>
> [ANALYST]: *There is nothing currently built on the property?*
>
> JARETT LEVAN: *No.* [Emphasis added.]

32.     On March 1, 2007, BankAtlantic filed its 2006 Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by Defendants A. Levan, White, and J. Levan, and reaffirmed the Company's financial results previously announced on January 31, 2007. The Company's 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶21, *supra*.

33.     On April 25, 2007, the Company issued a press release entitled "BankAtlantic Bancorp Reports Financial Results for First Quarter, 2007." Therein, the Company, in relevant part, stated:

> BankAtlantic Bancorp, Inc. (NYSE:BBX), reported financial results for the quarter ended March 31, 2007. Net income for the first quarter of 2007 was $5.7 million, or $0.09 per diluted share, compared to $6.5 million, or $0.10 per diluted share reported for the first quarter of 2006. The Company recorded a loss from continuing operations of ($2.2) million, or ($0.04) per diluted

share, compared to income from continuing operations of $8.0 million, or $0.13 per diluted share for the first quarter of 2006.

\* \* \*

*Net Income -- "For the first quarter of 2007, the Bank's net income was $0.6 million, down from $10.2 million in the comparable 2006 quarter. As discussed in detail in subsequent sections of this release, the reduction was caused primarily by net interest margin compression, combined with an increased loan loss provision.* Both factors reflect current economic conditions impacting our business. Net income was also negatively impacted by the expenses associated with the 'store expansion program', as well as the costs associated with our steps to reduce personnel expense.

*Credit Quality -- "During the first quarter of 2007, non-accrual loans increased $19.6 million from the first quarter of 2006,* the majority of which related to residential land acquisition and development loans in our commercial real estate loan portfolio. As a result, the ratio of non-performing loans to total loans increased from 0.14% at March 31, 2006 to 0.55% at March 31, 2007. *The provision for loan losses in the first quarter of 2007 was $7.5 million, or 0.64% of average loans (annualized) versus $0.2 million, or 0.01% for the first quarter of 2006.* The allowance for loan losses increased $8.5 million from $41.9 million (0.94% of total loans) at March 31, 2006 to $50.4 million (1.08% of total loans) at March 31, 2007; and the ratio of allowance for loan losses to non-performing loans stood at 196% at March 31, 2007.

*"The current environment for residential land acquisition and development loans is a concern, particularly in Florida, and represents an area where we remain very cautious in our credit management. In view of market conditions, we anticipate we may experience further deterioration in the portfolio over the next several quarters as the market attempts to absorb an oversupply of available lot inventory.* [Emphasis added.]

34.   On April 26, 2007, BankAtlantic held an earnings conference call with investors and financial analysts. During this call, Defendant White, in relevant part, stated:

JIM WHITE: *Non-accrual assets went up to $49 million. We took that $5.7 million charge on one of the two credits that he discussed.* We expect this is going to be a tough year for residential land development. And the increase does not surprise us, given the condition in the market.

\* \* \*

[ANALYST]: And then just separately, on the credit side, you kind of indicated you kind of expect the soft period to last throughout 2007. That's your best guess at this point?

ALAN B. LEVAN: Yes, I think that based on what we're seeing in Florida -- while the press is still pretty ugly, and *the results in the homebuilding industry is pretty ugly*, there is absorption taking place. There are houses that are selling -- *they're selling at reduced margins -- these are from the new homebuilders -- they're selling at reduced margins to eliminate unsold inventory of houses*, and to eat up some of the available lot inventory.

So our best guess is that in a year, year and a half, *the homebuilders are going to start to be looking for opportunities to buy land again; either the land they've already contracted for that they've extended, or pricing will have been reduced in land, and they will start to come back into the market.* Because at the end of the day, they want to build houses.

\* \* \*

[ANALYST]: ... And I guess the question I have is, in light of the net charge-offs that were relatively small -- $650,000 -- why the reserving of $7.5 million. Can you explain that process, please?

VALERIE TOALSON: Of that $7.5 million, $5.7 of that was reserve specifically related to the additional non-accruals, one of the specific non-accruals that we put on this quarter. Otherwise, as we look at our portfolio and evaluate the Florida market -- particularly these segments that both Alan and Jim have spoken to -- being prudent in assessing the qualitative factors -- part of that increase is simply associated with that market as we see it today, and the fact that historically, like you said, our charge-offs have been very low. So when factoring that into our reserve calculation, felt it was prudent to increase that section of the allowance accordingly.

\* \* \*

ALAN B. LEVAN: We believe in our -- in this land portfolio, that the loan-to-values give us a reasonable margin for value reductions, so that we will still be okay in our portfolio. We didn't take write-downs on these two that we presented to you. We went non-accrual on them. And if we thought that a write-down was required, we would have taken the write-down, as we did last quarter, on a different credit. ...

We're talking about the loan-to-value. And this, of course, is the loan-to-value at the time the loan was made in the underwriting. The issue that all land is going through, all homebuilders are going through, and all new houses are going through, is reduction in pricing. And so, the phenomenon that is going on today, in Florida and nationally, is that the reason for the -- the reason that there's a slowdown is that houses aren't selling. In many cases, the reason they're not selling is because they're overpriced.

So the question is, will absorption disappear so that the prices are protected and will go up from there, or will there be an adjustment of pricing downward in lots and houses in order to get the economy moving again, in order to move houses?

Now when we do our valuations -- for purposes of whether we need to reserve or do charge-offs, or et cetera -- we're constantly looking to see what the current valuation is of these -- of the collateral in our portfolios. And to the extent that we see reductions in value, when we know it, if it impacts our loan or impairs our loan, then we're going to report it accordingly.

So the answer I gave you as relates to value, of course, was the original value. But to the extent that the market is slow, and there may be some devaluation going on -- which is very difficult to determine, because there's not a lot of sales going on. There's not a lot of home sales going on, and there's not a lot of land portfolios that are being sold anymore to the national homebuilders. Everybody's just looking for extensions, waiting for the market to get better.

***So we haven't seen any increase in value. But we haven't seen substantial decrease in value. It's just kind of staying at the same level.*** And that's why we're watching it so carefully and are concerned about it. [Emphasis added.]

35.    On May 10, 2007, BankAtlantic filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants A. Levan and White, and reaffirmed the Company's financial results previously announced on April 25, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶21, *supra*.

36.    On July 24, 2007, the Company issued a press release entitled "BankAtlantic Bancorp Reports Financial Results for Second Quarter, 2007."    Therein, the Company, in relevant part, stated:

> BankAtlantic Bancorp, Inc. (NYSE:BBX) today announced financial results for the quarter ended June 30, 2007. Net income was $11.6 million, or $0.19 per diluted share, compared to net income of $8.1 million, or $0.13 per diluted share, for the second quarter of 2006. Income from continuing operations was $11.7 million, or $0.20 per diluted share, compared to $10.4 million, or $0.17 per diluted share, for the 2006 period.
>
> Net income for the first six months of 2007 was $17.3 million, or $0.28 per diluted share, compared to $14.5 million, or $0.23 per diluted share, for the comparable 2006 period. Income from continuing operations for the first six months of 2007 was $9.5 million, or $0.16 per diluted share, compared to $18.5 million, or $0.29 per diluted share, for the comparable 2006 period.
>
> * * *
>
> ***BankAtlantic Bancorp's Chairman and Chief Executive Officer, Alan B. Levan, commented, "While we remain committed to the expansion of BankAtlantic through organic growth, we understand that we are in a very challenging economic cycle. This quarter's financial results compared to the prior year reflect growth in deposit accounts, continued opening of new stores, and our focus on operational efficiency. However, it also reflects the significant impact of the economic cycle on our business with margin compression, higher non-performing asset levels and an increase in our loan loss reserves.***
>
> **BankAtlantic Highlights**
>
> Net Income - "For the second quarter of 2007, BankAtlantic's net income was $10.4 million, down from $12.7 million in the comparable 2006 quarter. As discussed in detail later in this release, the decline was due primarily to net interest margin compression, costs associated with opening new stores, and an increased loan loss provision. These factors were offset in part during the quarter by an increase in non-interest income, a decrease in non-interest expense and a lower provision for income taxes, reflecting a lower effective tax rate based on the amount of projected tax-exempt income anticipated for the year."

* * *

Credit Quality - "The economic cycle has created a degree of uncertainty, particularly in Florida. As such, we remain cautious in our credit management. The following paragraphs are offered to provide additional clarity regarding the characteristics of our Commercial and Residential portfolios.

*Commercial Loans - "The Bank's Commercial Real Estate loan portfolio at June 30, 2007 totaled $1.4 billion. This portfolio consists of retail, industrial, residential construction and development loans. Most of these loans are personally guaranteed, BankAtlantic's interest in any of these loans generally does not exceed $20.0 million, and single borrower concentrations are limited to $40.0 million. Approximately twelve loans in this portfolio, aggregating approximately $135 million, are characterized as 'Builder Land Loans'. 'Builder Land Loans' were made to borrowers who have agreements to sell the underlying collateral to national and local home builders pursuant to option contracts. However, due to the deterioration in the Florida housing market, some of these option contracts have been cancelled or modified. We continue to monitor the impact of the weak homebuilding environment on this portfolio. Although our non-accrual loans declined $3.9 million in the quarter from the first quarter of 2007, we may have additional downgrades and additional provisions relating to the portfolio if the housing market does not improve.* [Emphasis added.]

37.     On August 9, 2007, BankAtlantic filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants A. Levan and Toalson, and reaffirmed the Company's financial results previously announced on July 24, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶21, *supra.*

38.     The statements contained in ¶¶ 20 – 37 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company had granted a $27 million loan without having obtained an adequate appraisal of the underlying collateral; (2) that the Company had failed to properly classify this under-collateralized $27 million loan as an impaired loan; (3) that the Company's exposure to "at-risk" loans was

significantly understated; (4) that the Company had significantly under-reserved for loan losses in its portfolio, which had the effect of understating the Company's loan loss reserves and overstating its net income; (5) that the Company had deferred the recognition of losses associated with certain non-accrual loans rather than taking timely writedowns on such loans; (6) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times; (7) that the defendants had failed to comply with the Company's policies relating to collateral based lending, underwriting and risk management; (8) that the Company lacked adequate internal and financial controls; and (9) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

### The Truth Begins to Emerge

39.     On October 25, 2007, the Company shocked investors when it issued a press release entitled "BankAtlantic Bancorp Reports Financial Results for the Third Quarter 2007." Therein, the Company, in relevant part, stated:

> BankAtlantic Bancorp, Inc. (NYSE:BBX) today *announced a net loss of ($29.6) million, or ($0.52) per diluted share for the quarter ended September 30, 2007, compared to net income of $2.5 million, or $0.04 per diluted share, for the third quarter of 2006. The company recorded a loss from continuing operations of ($29.6) million, or ($0.52) per diluted share for the 2007 quarter, compared to income from continuing operations of $7.4 million, or $0.12 per diluted share, for the 2006 quarter.*
>
> *Net loss for the nine months of 2007 was ($12.3) million, or ($0.21) per diluted share, compared to net income of $17.1 million, or $0.27 per diluted share, for the comparable 2006 period. Income (loss) from continuing operations for the nine months of 2007 was ($20.1) million, or ($0.34) per diluted share, compared to $25.8 million, or $0.41 per diluted share, for the comparable 2006 period.*
>
> *BankAtlantic Bancorp's Chairman and Chief Executive Officer, Alan B. Levan, commented, "This quarter's financial results*

*reflect the continuing impact of the current economic environment on our business, particularly the deteriorating residential real estate market, contributing to higher non-performing asset levels, increased loan loss reserves, further valuation impairment of real estate owned and held for sale, and net interest margin compression. The impact of the decline in the Florida residential real estate market has been significant. We do not anticipate that market conditions will improve in the near-term and expect that the negative factors impacting this quarter's results may continue to affect us in the fourth quarter and into 2008.*

"While our results this quarter were disappointing, our balance sheet remains strong. We remain well capitalized and have significant liquidity. Additionally, as detailed later in this release, we have decided to slow our store expansion program in support of our commitment to manage expenses in the current economic environment.

### BankAtlantic Highlights

Net Income - "For the third quarter of 2007, BankAtlantic's net loss was ($27.1) million, down from net income of $9.8 million in the comparable 2006 quarter. As discussed in detail later in this release, the decline was driven by increased loan loss provisions and impairments of real estate owned and held for sale. Other factors contributing to the decline included net interest margin compression and costs associated with opening new stores, offset in part by an increase in non-interest income.

*Credit Quality - "Non-performing loans increased from $21.8 million at June 30, 2007 to $165.4 million at September 30, 2007* resulting primarily from the placement of eleven commercial real estate loans totaling $148.7 million on non-accrual status. As a result, the ratio of non-performing loans to total loans increased from 0.47% at June 30, 2007 to 3.53% at September 30, 2007 and the ratio of non-performing assets to total loans plus other assets increased from 0.94% at June 30, 2007 to 3.74% at September 30, 2007. *The Bank's loss experience for the quarter ended September 30, 2007 was a net charge-off of $11.3 million compared to a net recovery of $0.2 million for the quarter ended September 30, 2006. Included in the $11.3 million net charge-off was $8.8 million related to the write-down of one 'builder land bank loan'* and consumer net charge-offs of $1.6 million, representing primarily home equity lines of credit. ('Builder land bank loans' are characterized as loans made to borrowers with

31

agreements to sell the underlying collateral to national and local home builders pursuant to option contracts.)

"The rapid deterioration in the Florida real estate market and the associated increase in non-performing loans required an increase in our allowance for loan losses at quarter-end. The provision for loan loss in the third quarter of 2007 was $48.9 million or 1.04% of average loans for the third quarter of 2007 versus $0.3 million or 0.01% of average loans for the third quarter of 2006. The allowance for loan losses increased to $92.4 million (1.97% of total loans) at September 30, 2007 compared to $42.5 million (0.91% of total loans) at September 30, 2006. This quarter's provision included $27.8 million in specific reserves on nine non-performing loans aggregating $104.8 million. The ratio of the allowance for loan losses less specific reserves, to non-performing loans without specific reserves stood at 107% at September 30, 2007 versus 129% at September 30, 2006. Characteristics of our Commercial, Residential and Consumer loan portfolios are detailed below.

\* \* \*

*"We are monitoring this portfolio very closely due to rapidly changing conditions impacting both the underlying collateral values and the projected repayment sources in the current environment. We do not anticipate that the housing market will improve in the near-term, and accordingly, additional downgrades and additional provisions relating to this portfolio may be required.*

Purchased Residential Loans - "Our Purchased Residential Mortgage portfolio was $2.2 billion at quarter-end, representing approximately 47% of the Bank's total loans. As we have previously indicated, this portfolio does not include sub-prime or negative amortizing loans, the average FICO score in this portfolio was 741 at the time of origination, and the average original loan-to-value of the portfolio was 68%. Quarter-end delinquencies, including non-accrual loans, were 0.50% of the unpaid principal balance, and our loss history on this portfolio over the past twelve months is approximately 0.01% of the average outstanding balances.

\* \* \*

"In summary, we are working closely with our residential land borrowers in this difficult economic environment. We continue to evaluate available opportunities to reduce expenses and improve

profitability. At the same time, we are analyzing new deposit products and services with a goal of increasing our core deposits and providing compelling value to our customers," concluded Jarett S. Levan. [Emphasis added.]

40.    On this news, the Company's shares fell $2.93 per share, or over 38.3 percent, to close on October 26, 2007 at $4.72 per share, on unusually heavy trading volume.

41.    Morningstar, an investment research provider, assigns proprietary "star ratings" to securities based on its analysts' estimates of their fair value. A 5-star stock is a good value at its current price, a 1-star stock is not a good value at its current price. As recently as October 23, 2007, Morningstar rated BankAtlantic as a "5-star" stock, its highest rating. Following the Company's disclosures of October 25, 2007, on October 26, 2007, Morningstar issued an analyst report entitled "BankAtlantic's 3Q a Shocker." This report, in relevant part, stated:

> BankAtlantic Bancorp's BBX third-quarter results revealed that the firm had approximately an additional $383 million in land acquisition, development, and construction loans similar to the $135 million in builder land loans it disclosed in the previous quarter. *It now appears there is a total of $530 million in questionable loans in its portfolio. We'd said before that writing off all of the builder land loans would reduce our fair value estimate by about $2. As these questionable loans are nearly 4 times as large as previously disclosed, their write-off would have a much larger effect on our valuation. We are placing our fair value estimate for BankAtlantic under review and will have an update after the bank's conference call.* [Emphasis added.]

42.    Then on October 29, 2007, Morningstar issued an updated analyst report on BankAtlantic. In downgrading the Company's stock rating to "3-star," the analyst report, in relevant part, stated:

> BankAtlantic BBX reported a significant third-quarter loss, but *more troubling was the revelation that the bank is holding nearly $530 million in risky residential land development loans. As a result, we are slashing our fair value estimate, increasing our risk rating, and lowering our Stewardship Grade.*

*During the previous quarter, the bank had acknowledged only about $135 million in speculative builder land bank loans. The increase in at-risk loans from $135 million to $530 million, in our opinion, involves loans with very similar credit characteristics to those previously disclosed.* However, management did not discuss the loans in the other two categories-- land acquisition and development loans and land acquisition, development, and construction loans--until this quarter, because credit quality did not deteriorate in these loan categories until September. *Essentially, these are the same types of loans as the builder land bank loans, but made to different types of borrowers.* Builder land bank loans are made to investors who have obtained contracts to sell land used as collateral for the loans to homebuilders. Land acquisition and development loans are made to investors looking to sell land to homebuilders, but these investors do not have sales contracts for the land currently in place. Land acquisition, development, and construction loans are made to homebuilders who plan to develop homes on the land themselves.

*We believe that in the long run, all three loan categories will have similar credit characteristics. When BankAtlantic first disclosed the $135 million in loans, we foresaw lowering our fair value estimate by $2 in the event these loans had to be written off completely. With the revelation of nearly 4 times as much in questionable loans, the impact is much greater. Furthermore, we now believe that it is likely BankAtlantic is holding commercial real estate land development loans that could be equally risky in the long run. Our faith in management's underwriting, risk-management ability, and forthrightness has eroded. We believe management took a large concentrated risk, putting the bank in harm's way, and an investment in BankAtlantic is now speculative at best.*

**Thesis 10-29-2007**

BankAtlantic may have taken its strategy of being Florida's most friendly bank too far. *Specifically, the bank was far too friendly in lending to speculators, developers, and homebuilders looking to capitalize on the booming south Florida real estate market.* After reviewing BankAtlantic's third-quarter earnings results and its *disclosure of significant trouble in its loan book, we are lowering our fair value estimate, raising our risk rating, and reducing our Stewardship Grade.*

*The bank has at least $530 million of speculative loans involving land development--the value of which is up in the air today--and we believe these loans could impair the long-term survivability of*

34

*the bank as a stand-alone entity. We believe an investment in BankAtlantic is only for speculative investors.*

\* \* \*

*BankAtlantic's valuation is no longer dependent on the convenience strategy. Today, its long-term value depends on its ability to work through the questionable loans in its portfolio.* The loans in question today are in three categories: builder land bank loans; land acquisition and development loans; and land acquisition, development, and construction loans. With Florida's real estate market tumbling, the value of undeveloped land is highly questionable. Homebuilders and developers are strapped, and it is likely that many of the loans may come back to the bank. Additionally, we believe BankAtlantic may have additional commercial real estate loans in its portfolio for commercial land development, which could also be problematic. Furthermore, our confidence in management has eroded, given its unwillingness to be forthright about the risk in the bank's loan book.

## Valuation

*We are slashing our fair value estimate to $5 per share from $15. Our valuation for BankAtlantic is entirely dependent on the level of charge-offs the bank will assume in its portfolio of more than $530 million of land development loans. We can easily foresee a scenario where the bank could be stuck holding the bag for more than $200 million in charge-offs on this portfolio.* According to management, the average loan/cost on these risky loans is between 75% and 80%. *We don't think it would be unrealistic to see the value of the collateral supporting the loans deteriorate by 50% or more, which could lead to about $200 million in charge-offs,* by our account. This is what we have modeled into our valuation. *Under this scenario, the bank's regulatory capital would be tested and regulators could force BankAtlantic to sell out at an extreme discount to a stronger institution.* If charge-offs are more manageable, however, the bank is worth significantly more than its book value of $8 today.

## Risk

The overwhelming risk facing BankAtlantic today is credit risk as the south Florida real estate market deteriorates. *The bank has acknowledged approximately $530 million of high-risk land development loans.* The bank must work with the borrowers of these loans to try to preserve the value of the assets. In many cases, BankAtlantic will probably have to foreclose on developments,

acquire the land, and then seek buyers of the projects. *Also, the bank could have assets in addition to the $530 million in residential land development loans that could quickly become problematic.*

\* \* \*

### Management & Stewardship

Chairman and CEO Alan B. Levan and vice chairman John E. Abdo are much more businessmen than bankers. They hold the same titles at BFC Corporation (BFF), a holding company that owns more than 20% of BankAtlantic and controls more than 50% of the voting interest in the company. Besides BankAtlantic Bancorp, BFC holds equity stakes in Levitt (LEV), Benihana (BNHNA), and privately held companies. *We are disappointed with management's revelation in the third quarter of an additional $383 million in land acquisition, development, and construction loans similar to the $135 million in builder land loans it disclosed in the previous quarter. In our opinion, it appears the portfolios have very similar credit qualities and should have been disclosed simultaneously. We have reduced our Stewardship Grade as a result.*

\* \* \*

### Profitability

*Profitability will be hard to come by in the near future;* BankAtlantic faces asset-quality issues as the south Florida real estate market falls substantially.

### Financial Health

*BankAtlantic's long-term financial health is in question. The bank is saddled with more than $530 million in risky land development loans whose value is in question. If a substantial amount of these loans go bad, the bank's regulatory capital ratios will be severely tested in the coming year.* [Emphasis added.]

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

43. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased BankAtlantic's securities between November 9, 2005 and October 25, 2007, inclusive (the "Class

Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, BankAtlantic's securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by BankAtlantic or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

      (b)     whether statements made by defendants to the investing public during the

Class Period misrepresented material facts about the business, operations and management of BankAtlantic; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

48.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

49.    The market for BankAtlantic's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements, and failures to disclose, BankAtlantic's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired BankAtlantic's securities relying upon the integrity of the market price of BankAtlantic's securities and market information relating to BankAtlantic, and have been damaged thereby.

50.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of BankAtlantic's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

51.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about BankAtlantic's financial well-being, business relationships, and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of BankAtlantic and its financial well-being, business relationships, and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

52.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

53.    During the Class Period, Plaintiff and the Class purchased BankAtlantic's securities at artificially inflated prices and were damaged thereby. The price of BankAtlantic's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

54.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding BankAtlantic, their control over, and/or receipt and/or modification of BankAtlantic's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning BankAtlantic, participated in the fraudulent scheme alleged herein.

55.    Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 821,525 shares of the Company's stock for gross proceeds of $14,760,724, including over $4.9 million in gross proceeds received by Defendant A. Levan. This trading by Company insiders during the Class Period is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| August 28, 2007 | Snyder, Marcia K. | 7,045 | $8.55 - $8.59 | $60,000 |
| May 22, 2007 | DiGiulian, Bruno | 3,950 | $9.54 | $37,683 |
| May 21, 2007 | DiGiulian, Bruno | 20,988 | $9.41 | $197,497 |
| April 2, 2007 | Ginestra, Mary E. | 18,340 | $10.43 | $191,286 |
| March 30, 2007 | Sarrica, Lewis | 1,000 | $11.00 | $11,000 |
| March 5, 2007 | Sarrica, Lewis | 4,462 | $12.34 | $55,061 |
| March 1, 2007 | Sarrica, Lewis | 1,000 | $12.75 | $12,750 |
| February 14, 2007 | Sarrica, Lewis | 1,000 | $13.36 | $13,360 |
| February 1, 2007 | Sarrica, Lewis | 1,000 | $13.08 | $13,080 |
| January 16, 2007 | Sarrica, Lewis | 1,000 | $13.54 | $13,540 |
| January 3, 2007 | Sarrica, Lewis | 1,000 | $13.87 | $13,870 |

| December 29, 2006 | DiGiulian, Bruno | 897 | $13.91 | $12,477 |
|---|---|---|---|---|
| December 28, 2006 | Levan, Alan B. | 1,500 | $14.00 | $21,000 |
| December 28, 2006 | Abdo, John E. | 7,300 | $14.00 | $102,200 |
| December 15, 2006 | Sarrica, Lewis | 1,000 | $13.48 | $13,480 |
| December 1, 2006 | Sarrica, Lewis | 1,000 | $13.02 | $13,020 |
| November 30, 2006 | DiGiulian, Bruno | 896 | $12.98 | $11,630 |
| November 15, 2006 | Sarrica, Lewis | 1,000 | $13.53 | $13,530 |
| November 1, 2006 | Sarrica, Lewis | 1,000 | $13.09 | $13,090 |
| October 31, 2006 | DiGiulian, Bruno | 897 | $13.04 | $11,696 |
| October 16, 2006 | Sarrica, Lewis | 1,000 | $13.57 | $13,570 |
| October 2, 2006 | Levan, Alan B. | 6,000 | $14.00 | $84,000 |
| October 2, 2006 | Sarrica, Lewis | 1,000 | $13.99 | $13,990 |
| September 29, 2006 | DiGiulian, Bruno | 896 | $14.47 | $12,965 |
| September 15, 2006 | Sarrica, Lewis | 1,000 | $14.78 | $14,780 |
| September 1, 2006 | Sarrica, Lewis | 1,000 | $14.10 | $14,100 |
| September 1, 2006 | Snyder, Marcia K. | 15,880 | $14.07 | $223,431 |
| September 1, 2006 | Snyder, Marcia K. | 16,242 | $14.05 - $14.14 | $229,000 |
| August 31, 2006 | DiGiulian, Bruno | 897 | $14.04 | $12,593 |
| August 21, 2006 | Mariner, Jonathan D. | 19,593 | $14.15 | $277,240 |
| August 15, 2006 | Sarrica, Lewis | 1,000 | $14.00 | $14,000 |
| August 4, 2006 | DiGiulian, Bruno | 1,000 | $13.97 | $13,970 |
| August 1, 2006 | Sarrica, Lewis | 1,000 | $13.85 | $13,850 |
| July 31, 2006 | DiGiulian, Bruno | 896 | $13.86 | $12,418 |
| July 31, 2006 | Coldren, Steven | 7,511 | $13.87 | $104,177 |
| July 17, 2006 | Sarrica, Lewis | 1,000 | $14.34 | $14,340 |
| July 3, 2006 | Sarrica, Lewis | 1,000 | $14.86 | $14,860 |
| June 30, 2006 | DiGiulian, Bruno | 897 | $14.92 | $13,383 |
| June 15, 2006 | Sarrica, Lewis | 1,000 | $14.18 | $14,180 |
| June 2, 2006 | Levan, Alan B. | 7,500 | $14.72 | $110,400 |
| June 1, 2006 | Sarrica, Lewis | 1,000 | $14.70 | $14,700 |

| May 16, 2006 | DiGiulian, Bruno | 7,064 | $15.26 | $107,796 |
| May 15, 2006 | Sarrica, Lewis | 1,000 | $15.30 | $15,300 |
| May 15, 2006 | Abdo, John E. | 7,500 | $15.30 | $114,750 |
| May 3, 2006 | Ginestra, Mary E. | 18,340 | $15.12 | $277,300 |
| May 2, 2006 | Levan, Alan B. | 7,500 | $15.02 | $112,650 |
| May 1, 2006 | Sarrica, Lewis | 1,000 | $15.02 | $15,020 |
| April 17, 2006 | Sarrica, Lewis | 1,000 | $15.00 | $15,000 |
| April 17, 2006 | Abdo, John E. | 7,500 | $15.32 | $114,900 |
| April 3, 2006 | Sarrica, Lewis | 1,000 | $14.31 | $14,310 |
| April 3, 2006 | Levan, Alan B. | 7,500 | $14.33 | $107,475 |
| March 15, 2006 | Sarrica, Lewis | 1,000 | $13.88 | $13,880 |
| March 15, 2006 | Abdo, John E. | 22,500 | $14.00 | $315,000 |
| March 15, 2006 | Levan, Alan B. | 15,000 | $14.00 | $210,000 |
| February 24, 2006 | Snyder, Marcia K. | 13,572 | $13.60 | $184,579 |
| February 24, 2006 | Snyder, Marcia K. | 28,820 | $13.66 - $13.77 | $3,950,002 |
| February 14, 2006 | Sarrica, Lewis | 2,528 | $13.40 | $33,875 |
| February 10, 2006 | Abdo, John E. | 173,357 | $13.73 | $2,380,191 |
| February 10, 2006 | Levan, Alan B. | 310,415 | $13.73 | $4,261,997 |
| December 12, 2005 | DiGiulian, Bruno | 4,832 | $13.81 - $13.84 | $67,000 |
| November 10, 2005 | White, James | 5,000 | $14.48 | $72,400 |
| November 10, 2005 | White, James | 13,999 | $14.49 | $202,845 |
| November 10, 2005 | McGregor, Susan D. | 7,511 | $14.28 | $107,257 |
| | **TOTAL:** | **821,525 Shares** | | **$14,760,724 Gross Proceeds** |

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

56.    At all relevant times, the market for BankAtlantic's securities was an efficient

market for the following reasons, among others:

        (a)     BankAtlantic's securities met the requirements for listing, and were listed

and actively traded on the NYSE, a highly efficient and automated market;

    (b)    As a regulated issuer, BankAtlantic filed periodic public reports with the SEC and the NYSE;

    (c)    BankAtlantic regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    (d)    BankAtlantic was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

    57.    As a result of the foregoing, the market for BankAtlantic's securities promptly digested current information regarding BankAtlantic from all publicly-available sources and reflected such information in the price of BankAtlantic's securities. Under these circumstances, all purchasers of BankAtlantic's securities during the Class Period suffered similar injury through their purchase of BankAtlantic's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

    58.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of BankAtlantic who knew that those statements were false when made.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

59.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase BankAtlantic's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

61.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for BankAtlantic's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

62.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about BankAtlantic's financial well-being, business relationships, and prospects, as specified herein.

63.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of BankAtlantic's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about BankAtlantic and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of BankAtlantic's securities during the Class Period.

64.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and

participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

65.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing BankAtlantic's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, business relationships, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

66.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of BankAtlantic's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of BankAtlantic's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in

which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired BankAtlantic's securities during the Class Period at artificially high prices and were damaged thereby.

67.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that BankAtlantic was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their BankAtlantic securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

70.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.    The Individual Defendants acted as controlling persons of BankAtlantic within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.    As set forth above, BankAtlantic and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class

members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 30, 2007

**MURRAY, FRANK & SAILER LLP**

Brian P. Murray (BM 9954)
Gregory Linkh (GL 0477)
275 Madison Avenue, Suite 801
New York, NY 10016
Phone: (212) 682-1818
Fax:  (212) 682-1892

**SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP**
Richard A. Maniskas
D. Seamus Kaskela
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

**Attorneys for Plaintiff**