**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

HARRY PLOSS, *Individually and on Behalf of All Others Similarly Situated*,

                              Plaintiff,                              07 cv. 10937 (SWK)

v.

BANKATLANITC BANCORP INC., JAMES A. WHITE, VALERIE C. TOALSON, JARETT S. LEVAN and ALAN B. LEVAN

                              Defendants.

_____

**DECLARATION OF EVAN J. SMITH IN SUPPORT OF THE MOTION OF OTIS BROWN AND DONNA BROWN TO BE APPOINTED LEAD PLAINTIFFS AND FOR APPROVAL OF LEAD PLAINTIFFS' SELECTION OF LEAD COUNSEL**

Evan J. Smith, declares under penalty of perjury this 28th day of December, 2007:

1.      I am a partner with the law firm of Brodsky & Smith, LLC, proposed Lead Counsel for class members Otis Brown and Donna Brown.  I respectfully submit this declaration in support of the motion of Otis Brown and Donna Brown for the appointment of Lead Plaintiff and for approval of Lead Plaintiffs' selection of Lead Counsel.

2.      Attached hereto as Exhibit A are true and correct copies of the signed certifications of class members Otis Brown and Donna Brown pursuant to the requirements of the Private Securities Litigation Reform Act of 1995.  15 U.S.C. § 77z-4(a)(2) and 15 U.S.C. § 78u-4(a)(2).

3.      Attached hereto as Exhibit B is a true and correct copy of the notice to class members concerning the first-filed of the above-captioned actions that was published on October 29, 2007 on *Marketwire* advising the public of the pendency of a class action filed on behalf of shareholders of BankAtlantic Bancorp Inc. ("BankAtlantic").

4.      Attached hereto as Exhibit C is a true and correct copy of a chart of the transactions and approximate losses in BankAtlantic securities for Otis Brown and Donna Brown.

5.      Attached hereto as Exhibit D is a true and correct copy of the class action styled as *Hubbard v. BankAtlantic Bancorp Inc.,* No. 07 cv 61542 (UU) (S.D. Fla. filed October 29, 2007).

6.      Attached hereto as Exhibit E is a true and correct copy of the firm biography for Brodsky & Smith, LLC, seeking the Court's approval as Lead Counsel.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: December 28, 2007                    *s/ Evan J. Smith, Esquire*
                                            Evan J. Smith, Esquire

## PLAINTIFF'S CERTIFICATION

I, (Mr./Ms.) _Donna M. Brown_ , ("Plaintiff") declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in ___BANKATLANTIC___ of securities during the Class Period specified in the Complaint are as follows (use additional sheet if necessary):

| Date | # of Shares Purchased | # of Shares Sold | Price |
|------|----------------------|------------------|-------|
|      | See attached sheets 5,800 shares |  |  |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed as follows:]

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _19th_ day of _November_ , 2007.

Sign Name: _Donna M Brown_
Print Name: Donna M. Brown
Address: 445 Muirfield Dr, Atlantis
State, Zip Code: FL. 33462
County: Palm Beach
Country (if not USA):

## PLAINTIFF'S CERTIFICATION

I, (Mr./~~Ms.~~)  _Otis S. Brown_  , ("Plaintiff") declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in  BANKATLANTIC   of securities during the Class Period specified in the Complaint are as follows (use additional sheet if necessary):

| **Date** | **# of Shares Purchased** | **# of Shares Sold** | **Price** |
|---|---|---|---|
| | See attached sheets 94,100 shares | | |

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed as follows:]

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _19th_ day of _November_ , 2007.

Sign Name:      _Otis S. Brown_
Print Name:      _Otis S. Brown_
Address:      _445 Muirfield Dr., Atlantis_
State, Zip Code:      _FL  33462_
County:      _Palm Beach_
Country (if not USA):

*Otis S. Brown*

445 Muirfield Dr., Atlantis, FL
33462
561-642-3393
otybrown@aol.comn

*November 19, 2007*

### History of Bank Atlantic Stock Purchases for Otis S. Brown Account

| DATE | # OF SHARES PURCHASED | PRICE | PRICE PER SHARE |
|------|----------------------|-------|-----------------|
| 3/22/07 | 600 | $ 6,939.95 | $ 11.56 |
| 4/12/07 | 400 | 4,209.95 | 10.52 |
| 4/19/07 | 2,000 | 22,269.95 | 11.13 |
| 4/27/07 | 500 | 5,409.95 | 10.81 |
| 5/08/07 | 1,000 | 9,919.95 | 9.91 |
| 5/14/07 | 300 | 2,928.95 | 9.76 |
| 6/01/07 | 200 | 1,878.95 | 9.39 |
| 6/21/07 | 650 | 5,635.44 | 8.66 |
| 6/26/07 | 100 | 876.95 | 8.77 |
| 7/17/07 | 14,250 | 112,868.95 | 7.92 |
| 8/27/07 | 500 | 4,154.95 | 8.30 |
| 9/17/07 | 13,100 | 103,585.89 | 7.90 |
| 9/17/07 | 6,900 | 54,717.00 | 7.93 |
| 10/22/07 | 10,000 | 79,809.95 | 7.98 |
| 10/22/07 | 1,400 | 11,013.95 | 7.86 |
| 10/22/07 | 1,600 | 12,592.00 | 7.87 |
| 10/22/07 | 1,500 | 11,820.00 | 7.88 |
| 10/26/07 | 1,300 | 6,522.82 | 5.01 |
| 10/31/07 | 22,400 | 93,184.99 | 4.16 |
| 10/31/07 | 2,600 | 10,868.00 | 4.18 |

Total Shares    81,300     $ 561,210.54

### History of Bank Atlantic Stock Purchases for Otis S. Brown IRA Account

| DATE | # OF SHARES PURCHASED | PRICE | PRICE PER SHARE |
|------|----------------------|-------|-----------------|
| 8/09/06 | 125 | $ 1,758.95 | $ 14.07 |
| 11/21/06 | 500 | 6,759.95 | 13.51 |
| 2/23/07 | 2,375 | 31,834.95 | 13.40 |
| 4/27/07 | 300 | 3,249.95 | 10.83 |
| 6/26/07 | 350 | 3,047.60 | 8.70 |
| 8/16/07 | 1,350 | 11,417.45 | 8.45 |

| 8/16/07 | 800 | 6,537.95 | 8.17 |
| 8/16/07 | 4,200 | 34,314. — | 8.17 |
| 8/16/07 | 1,000 | 8,139.95 | 8.14 |
| 8/27/07 | 500 | 4,154.45 | 8.30 |
| 10/15/07 | 500 | 4,134.45 | 8.26 |
| ~~10/18/07~~ | ~~500~~ | | |
| 10/31/07 | 300 | 1,503.92 | 5.01 |
| Total Shares | 12,800 | 116,854.57 | |

History of Bank Atlantic Stock Purchases for Donna M. Brown Account

| 8/8/06 | 250 | 3,397.45 | 13.58 |
| 2/23/07 | 1,375 | 18,393.70 | 13.37 |
| 3/20/07 | 2,000 | 22,869.95 | 11.43 |
| 4/13/07 | 375 | 3,921.20 | 10.45 |
| 5/14/07 | 300 | 2,928.95 | 9.76 |
| 6/01/07 | 200 | 1,865.95 | 9.32 |
| 6/21/07 | 500 | 4,343.65 | 8.68 |
| 10/31/07 | 800 | 3,977.15 | 4.97 |
| Total Shares | 5,800 | 61,698.00 | |

Yahoo!  My Yahoo!  Mail    Make Y! your home page          Search:

 FINANCE    Welcome, **esmith5371**        Finance Home - Help
[Sign Out, My Account]



**Press Release**                                Source: Vianale & Vianale LLP

# Vianale & Vianale LLP Files Shareholder Class Action Lawsuit Against BankAtlantic Bancorp, Inc.

Monday October 29, 2:26 pm ET

BOCA RATON, FL--(MARKET WIRE)--Oct 29, 2007 -- Vianale & Vianale LLP announces that it filed a class action lawsuit on October 29, 2007 on behalf of purchasers of the securities of BankAtlantic Bancorp, Inc. ("BankAtlantic" or the "Company") (NYSE:BBX - News) between November 9, 2005 and October 25, 2007 (the "Class Period"). A copy of the firm's Complaint can be obtained by calling our offices or viewed on Vianale & Vianale LLP's website at: www.vianalelaw.com. The action (Case No. 07-61542) was filed in the United States District Court for the Southern District of Florida.

ADVERTISEMENT

## 34 Stocks that Doubled!

Motley Fool co-founder Tom Gardner's top pick is up 653%... David Gardner's top performer is up 612%.

Since they launched *Motley Fool Stock Advisor* in April 2002, a full 34 of their recommendations have doubled in value or more.

In a free report, The Motley Fool co-founders each reveal their No. 1 stock idea for 2008.

Another double? Find out now.

Click here for "The Motley Fool's 2 Top Picks!"

*Returns as of 10/16/2007*

The Complaint alleges that BankAtlantic, and certain of its officers and directors, violated the Securities Exchange Act of 1934. At the start of the Class Period, BankAtlantic touted its "negative provision for loan losses." Nevertheless, BankAtlantic materially understated reserves for real estate loan losses on its financial statements, and thus materially overstated net income. BankAtlantic gave a $27.8 million real estate loan without obtaining an independent appraisal of the real estate. The loan was granted to Michael Tringali, who worked together with Neil Mohamed Husani. The two men inflated land values and then flipped a series of properties in Florida to obtain higher real estate loans from several banks, including BankAtlantic. Husani and Tringali have been under FBI investigation for this scheme, which the Company either knew at the time or recklessly ignored.

BankAtlantic knew or recklessly ignored that the collateral underlying this $27.8 million loan -- vacant land in Manatee County, Florida -- was worth no more than $17.1 million. BankAtlantic deflected questions about the adequacy of its loan loss reserves for this property. BankAtlantic said it commissioned an "appraisal" of the property, but real estate experts questioned whether this appraisal had any basis. In April 2007, BankAtlantic announced that it was having difficulty with its Florida real estate portfolio but hid the true extent of the inadequacy of its loan loss reserves. On October 25, 2007, the Company announced that it had to increase its loan loss reserves substantially. The news sent BankAtlantic's shares down nearly 40%, from $7.45 to $4.72 on heavy trading volumes.

If you bought the securities of BankAtlantic between November 9, 2005 and October 25, 2007, no later than December 28, 2007, you may move the court to appoint you as lead plaintiff, a representative party that acts on behalf of other class members. The court must determine whether the class member's claim is typical of other members' claims, and whether the class member will adequately represent the class. Your ability to recover is not affected by the decision whether or not to serve as a lead plaintiff. Vianale & Vianale LLP is active in major litigations pending in federal and state courts. More about the firm is available on its website.

If you wish to discuss this case with us, or you have any questions concerning this notice, please contact:

*Contact:*

```
Kenneth J. Vianale, Esq.
Julie Prag Vianale, Esq.
Vianale & Vianale LLP
2499 Glades Road, Suite 112
Boca Raton, FL 33431
888-657-9960 (Toll Free)
561-392-4750
Email: Email Contact
       Email Contact
```

Source: Vianale & Vianale LLP

✉ Email Story        🔔 Set News Alert        🖨 Print Story

[                    ] [ Search News ]

Sponsor Results

**Try Forex Currency Trading at Forex.com**
Free $50,000 practice account with real-time charts, news and research.
www.forex.com

**Countrywide® Home Loans**
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.
www.Countrywide.com

**Free Investment Guide**
How to Invest Smarter from Ameriprise Financial.
www.Ameriprise.com

(What's This?)

Copyright © 2007 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Ad Feedback
Copyright © 2007 Marketwire. All rights reserved. All the news releases provided by Marketwire are copyrighted. Any forms of copying other than an individual user's personal reference without express written permission is prohibited. Further distribution of these materials is strictly forbidden, including but not limited to, posting, emailing, faxing, archiving in a public database, redistributing via a computer network or in a printed form.

BANKATLANTIC BANCORP INC. (NYSE – BBX)
CLASS PERIOD – 11/09/05 – 10/25/07

| PLAINTIFF | PURCHASE TRANSACTIONS | | | | SALES TRANSACTIONS | | | | SHARES HELD | ESTIMATED VALUE | ESTIMATED LOSSES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | DATE | SHARES | SHARE COST | PURCHASE AMOUNT | DATE | SHARES | SHARE PRICE | SALES AMOUNT | | | |
| OTIS BROWN | 8/09/06 | 125 | 14.07 | 1,759.95 | | | | | 125 | 590.00 | 1,169.95 |
| | 11/21/06 | 500 | 13.51 | 6,759.95 | | | | | 500 | 2,360.00 | 4,399.95 |
| | 2/23/07 | 2,375 | 13.40 | 31,834.95 | | | | | 2,375 | 11,210.00 | 20,624.95 |
| | 3/22/07 | 600 | 11.56 | 6,939.95 | | | | | 600 | 2,832.00 | 4,107.95 |
| | 4/12/07 | 400 | 10.52 | 4,209.95 | | | | | 400 | 1,888.00 | 2,321.95 |
| | 4/19/07 | 2,000 | 11.13 | 22,269.95 | | | | | 2,000 | 9,440.00 | 12,829.95 |
| | 4/27/07 | 500 | 10.81 | 5,409.95 | | | | | 500 | 2,360.00 | 3,049.95 |
| | 4/27/07 | 300 | 10.83 | 3,249.95 | | | | | 300 | 1,416.00 | 1,833.95 |
| | 5/08/07 | 1,000 | 9.91 | 9,919.25 | | | | | 1,000 | 4,720.00 | 5,199.95 |
| | 5/14/07 | 300 | 9.76 | 2,928.95 | | | | | 300 | 1,416.00 | 1,512.95 |
| | 6/01/07 | 200 | 9.39 | 1,879.95 | | | | | 200 | 944.00 | 935.95 |
| | 6/21/07 | 650 | 8.66 | 5,635.44 | | | | | 650 | 3,068.00 | 2567.44 |
| | 6/26/07 | 100 | 8.77 | 876.95 | | | | | 100 | 472.00 | 404.95 |
| | 6/26/07 | 350 | 8.70 | 3,047.60 | | | | | 350 | 1,652.00 | 1,631.60 |
| | 7/17/07 | 14,250 | 7.92 | 112,869.95 | | | | | 14,250 | 67,260.00 | 45,609.95 |
| | 8/16/07 | 1,350 | 8.45 | 11,417.45 | | | | | 1,350 | 6,372.00 | 5,045.45 |
| | 8/16/07 | 800 | 8.17 | 6,537.95 | | | | | 800 | 3,776.00 | 2,761.95 |
| | 8/16/07 | 4,200 | 8.17 | 34,314.00 | | | | | 4,200 | 19,824.00 | 14,490.00 |
| | 8/16/07 | 1,000 | 8.14 | 8,139.95 | | | | | 1,000 | 4,720.00 | 3,419.95 |
| | 8/27/07 | 500 | 8.30 | 4,154.95 | | | | | 500 | 2,360.00 | 1,794.45 |
| | 8/27/07 | 500 | 8.30 | 4,154.45 | | | | | 500 | 2,360.00 | 1,794.45 |
| | 9/17/07 | 13,100 | 7.90 | 103,585.89 | | | | | 13,100 | 61,837.00 | 41,753.89 |
| | 9/17/07 | 6,900 | 7.93 | 54,717.00 | | | | | 6,900 | 32,568.00 | 22149.00 |
| | 10/15/07 | 500 | 8.26 | 4,134.45 | | | | | 500 | 2,360.00 | 1,774.45 |
| | 10/22/07 | 10,000 | 7.98 | 79,809.95 | | | | | 10,000 | 47,200.00 | 32,609.95 |
| | 10/22/07 | 1,400 | 7.86 | 11,013.95 | | | | | 1,400 | 6,608.00 | 4,405.95 |
| | 10/22/07 | 1,600 | 7.87 | 12,592.00 | | | | | 1,600 | 7,552.00 | 5,040.00 |
| | 10/22/07 | 1,500 | 7.88 | 11,820.00 | | | | | 1,500 | 7,080.00 | 4,740.00 |
| Otis Brown Class Period Total | | 67,500 | | 565,985.18 | | 0 | | | 67,500 | 316,240.00 | 249,980.80 |

## BANKATLANTIC BANCORP INC. (NYSE – BBX)
### CLASS PERIOD – 11/09/05 – 10/25/07

| PLAINTIFF | PURCHASE TRANSACTIONS | | | | SALES TRANSACTIONS | | | | SHARES HELD | ESTIMATED VALUE | ESTIMATED LOSSES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | DATE | SHARES | SHARE COST | PURCHASE AMOUNT | DATE | SHARES | SHARE PRICE | SALES AMOUNT | | | |
| **DONNA BROWN** | 8/09/06 | 250 | 13.58 | 3,397.45 | | | | | 125 | 590.00 | 2,217.45 |
| | 2/23/07 | 1,375 | 13.37 | 18,393.70 | | | | | 2,375 | 11,210.00 | 11,903.70 |
| | 3/20/07 | 2,000 | 11.43 | 22,869.95 | | | | | 600 | 2,832.00 | 13,429.95 |
| | 4/13/07 | 375 | 10.45 | 3,921.20 | | | | | 400 | 1,888.00 | 2,151.20 |
| | 5/14/07 | 300 | 9.76 | 2,928.95 | | | | | 300 | 1,416.00 | 1,512.95 |
| | 6/01/07 | 200 | 9.32 | 1,865.95 | | | | | 200 | 944.00 | 921.95 |
| | 6/21/07 | 500 | 8.68 | 4,343.65 | | | | | 650 | 3,068.00 | 1,983.65 |
| **Donna Brown Class Period Total** | | **5,000** | | **57,720.85** | | **0** | | | **5,000** | **21,948.00** | **34,120.85** |

**TOTAL ESTIMATED LOSS OF OTIS BROWN AND DONNA BROWN**        **$284,101.85**

LAW OFFICES

# BRODSKY & SMITH, LLC

**240 MINEOLA BOULEVARD**
**MINEOLA, NY 11501**
—
516.741.4799
FAX 516.741.0626
www.brodsky-smith.com

PENNSYLVANIA OFFICE
TWO BALA PLAZA, SUITE 602
BALA CYNWYD, PA 19004
610.667.6200

CALIFORNIA OFFICE
9595 Wilshire Blvd., Ste 900
Beverly Hills, CA 90212
877-534-2590

NEW JERSEY OFFICE
1040 KINGS HIGHWAY NORTH, STE. 601
CHERRY HILL, NJ 08034
856.795.7250

Brodsky & Smith, LLC is a law firm that was organized under the Limited Liability Laws of the Commonwealth of Pennsylvania in July of 1998. The firm's attorneys are licensed to practice in both state and federal courts in the Commonwealth of Pennsylvania, the State of New Jersey, the District of Columbia, the State of California, and the State of New York.

The firm represents individuals and businesses in various types of litigation matters including, securities class action and shareholder derivative litigation, anti-trust litigation, civil rights litigation, complex commercial litigation, consumer protection litigation, mass-tort litigation, ERISA litigation and personal injury litigation.

The firm's offices are located in Bala Cynwyd – Pennsylvania, Cherry Hill - New Jersey, Mineola - New York and Beverly Hills - California.

# QUALIFICATIONS OF MEMBERS

### *JASON L. BRODSKY*:

Jason Lawrence Brodsky is a founding member of Brodsky & Smith, LLC. He limits his practice to protecting the rights of Plaintiffs through litigation. His current areas of practice include Class Action Civil Rights Litigation, Class Action Securities/Derivative Shareholder Litigation; Commercial Litigation; Anti-trust Litigation, Catastrophic Injury Litigation; and Workers' Compensation Litigation.

He is an experienced trial attorney, who has successfully obtained consent decrees, verdicts, and settlements in various state and federal courts around the country on behalf of injured, wronged, or discriminated against individuals and businesses. Prior to forming the firm, he was an attorney at a 150-attorney insurance defense firm in Philadelphia where he represented Fortune 500 clients, insurance companies, and municipal entities, including the City of Philadelphia.

He received his Juris Doctor from Widener University School of Law (1996) where he was a member of the Trial Advocacy Honor Society. He also received his Bachelor of Arts in Criminology from Pennsylvania State University (1993).

He is licensed to practice in both the Commonwealth of Pennsylvania (1996) and the State of New Jersey (1996).  He is also licensed to practice in the United States District Court for the Eastern District of Pennsylvania (1998) and the United States District Court of New Jersey (1996).  He has also been admitted *pro hac vice* in state and federal courts across the country in various matters.

### EVAN J. SMITH:

Evan Jason Smith is a founding member of Brodsky & Smith, LLC.  His current areas of practice include Anti-trust Litigation; Civil Rights Litigation, Class Action Securities and Shareholder Derivative Litigation; Commercial Litigation; ERISA Litigation; and Personal Injury Litigation.

He began his legal career as an attorney at a Philadelphia boutique litigation law firm where he worked on complex commercial litigation matters.  Prior to forming Brodsky & Smith, LLC, he was an attorney at a Philadelphia insurance defense law firm in the Premises and Casualty Liability Litigation Department.

In both 2005 and 2006, he was selected as a Pennsylvania Super Lawyers' Rising Star (Attorneys Under 40), an honor bestowed upon less than 2.5% of Pennsylvania attorneys. In May 2002, he convinced the court, in *McCain v. Beverly Enterprises, Inc.* CV-02-657 (E.D.Pa.), to reverse the long standing and prevailing case law which precluded injured plaintiffs from bringing a claim for damages under a negligence *per se* theory against medical facilities for violations of state and federal statutes regarding standard of care towards patients.  This reversal lowered the burden of proof in civil cases for injured plaintiffs when a governmental agency has found a defendant in violation of state and/or federal standard of care statutes.  This case has been cited by many jurisdictions across the country in nursing home neglect litigation.

Upon graduating law school, he served as a judicial law clerk for the Honorable Albert W. Sheppard, Jr. of the Philadelphia Court of Common Pleas, First Judicial District.  He also served as a student law clerk for the Honorable William H. Yohn of the United States District Court for the Eastern District of Pennsylvania and the Honorable John T.J. Kelly, Jr. of the Commonwealth of Pennsylvania Superior Court.

He received his Juris Doctor from Temple University School of Law (1996) where he was a member of the Moot Court Honor Society and the Political and Civil Rights Law Review.  He also served as a clinical intern at the Philadelphia District Attorney's Office.  He received his Bachelor of Arts in International Politics and a minor degree in Spanish from Pennsylvania State University (1993).

He is licensed to practice in state courts for the Commonwealth of Pennsylvania (1996), the State of New Jersey (1996), the District of Columbia (1999), the State of New York (2002), and the State of California (2006).  He is also licensed to practice in federal courts for the United States Supreme Court (2003); United States Court of Appeals for the Third Circuit (1998), the United States District Court for the Eastern District of Pennsylvania (1998), the United States District Court of New Jersey (1996), the United States District Court for the Southern District of New York (2002), the United States Court for the Eastern District of New York (2003), the United States District Court for the Northern District of New York (2003), the United States District Court for the District of Colorado (2003); the United States District Courts for the Northern, Southern, Central and Eastern Districts of California (2006).  He has also been admitted *pro hac vice* in state and federal courts across the country in various matters.

### *MARC L. ACKERMAN:*

Marc Louis Ackerman joined Brodsky & Smith, LLC as a partner in October 2002.  His current areas of practice include Class Action Securities/Shareholder Derivative Litigation; Consumer Protection Litigation, Commercial Litigation; Civil Rights Litigation; Insurance Litigation; and Personal Injury Litigation.

He began his legal career as an associate in the litigation department of a 250-attorney Philadelphia law firm.  After working for the Department of Justice as a Special Assistant United States Attorney for the Eastern District of Pennsylvania, he joined a 300-attorney Philadelphia law firm where he concentrated his practice in insurance and commercial litigation matters.  As a partner he represented Fortune 500 clients in insurance fraud, RICO, wrongful death and other complex insurance matters.  Just prior to joining Brodsky & Smith, LLC, he was Pennsylvania resident counsel for a small boutique class action firm based in Connecticut.

He received his Juris Doctor from Temple University School of Law (1989) where he served as the Director of Temple - LEAP, an organization dedicated to introducing secondary school students to the profession and practice of law.  He received his Bachelor of Arts from Villanova University (1986, cum laude).

He is licensed to practice in state courts for the Commonwealth of Pennsylvania (1989) and the State of New Jersey (1990).  He is also licensed to practice in federal courts for the United States Supreme Court (2003); United States Court of Appeals for the Third Circuit (1995); the Eastern District of Pennsylvania (1990) and the United States District Court of New Jersey (1990).  He has also been admitted *pro hac vice* in state and federal courts across the country in various matters.

***STEVEN S. WANG:***

Steven S. Wang joined Brodsky & Smith, LLC as of counsel in December 2005. His current practice areas include Commercial Litigation; Business Litigation; Insurance Litigation; and Personal Injury Litigation.

Prior to opening his own litigation practice in Los Angeles, Steve was an associate in the insurance coverage and business litigation department of Newmeyer & Dillion, LLP, a mid-sized full service law firm based in Newport Beach, California.   He is published in *Century Surety Co. v. Crosby Ins., Inc.* (2004) 124 Cal.App.4th 116, 21 Cal.Rptr.3d 115, *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 87 Cal.Rptr.2d 237, and *Mizzell v. Paul Revere Life Ins. Co.* (2000) 118 F.Supp.2d 1016 (Central District of California).  Steve is a member of the California State Bar, the Korean American Bar Association of Southern California, and the Los Angeles County Bar Association.

He received his Juris Doctor from Pepperdine University School of Law (1996), and his Bachelor of Arts from University of California, Irvine (1993, History).  While in law school, Steve served as a judicial extern to Honorable Ernest Robles and Honorable John J. Wilson (Ret.) of the United States Bankruptcy Court for the Central District of California.

# SECURITIES CLASS ACTION, SHAREHOLDER DERIVATIVE AND ERISA LITIGATION

Brodsky & Smith, LLC presently represents investors from all over the world in over three hundred (300) class action securities, ERISA and/or shareholder derivative cases pending in various state and federal courts in the United States.  The firm serves as lead counsel in *In re Ryland Group, Inc. Securities Litigation* pending in the Northern District of Texas (3:04-CV-541G) and co-Lead Counsel in *In re Custom Design Compressor Securities Litigation* pending in the District of New Mexico (05-cv-0848).  The firm also serves as Liaison Counsel in *In re S.A.C. Capital (Biovail) Securities Litigation* (USDC D.NJ 2006).

The firm is also Lead or Co-lead counsel in various shareholder derivative litigation matters alleging, *inter alia*, breach of fiduciary duties and corporate mismanagement.  In these actions, our firms' clients attempt to achieve corporate governance reforms on behalf of the companies.  The following are cases in which Brodsky & Smith, LLC currently serves as sole lead or co-lead counsel in shareholder derivative litigation matters in state and federal court across the country: *In re NVE Shareholder Derivative* Litigation, (Minnesota state Court); *In re Impac Mortgage*

4

*Holding Shareholder Derivative Litigation* (Orange County California state Court); *In re DHB Industries, Inc.* (Supreme Court of New York, Nassau County, 06-1422); *In re Harley-Davidson, Inc. Shareholder Derivative Litigation* (Wisconsin Circuit Court, Milwaukee County, 05-cv-006021); *In re The Mills Corporation Shareholder Derivative Litigation,* (U.S.D.C. E.D. Va. 06-0259) (co-Lead counsel); *In re OCA, Inc. Shareholder Derivative Litigation* (E.D. Louisiana  05-cv-2165); *In re Pfizer Shareholder Derivative* Litigation, (U.S.D.C. SDNY 1:04-10075); *In re Merck & Co. Shareholder Derivative Litigation*, (New Jersey Superior Court, Atlantic County (ATL-L-06939-05); *In re Express Scripts Shareholder Derivative Litigation* (Missouri Circuit Court, City of St. Louis, No.042-08632); *In re Avaya Shareholder Derivative Litigation* (D.N.J. 05-cv-2501); *In re Visteon Shareholder Derivative Litigation* (Michigan Circuit Court, Wayne County 05-506341).

The firm has been appointed as local counsel or assisting lead counsel in the following matters: *In re Vitesse Semiconductor Shareholder Derivative Litigation* (USDC C.D. Cal 2006); *In re Linear Technology Shareholder Derivative Litigation,* (Superior Court of California 2006); *In re Corinthian Colleges Shareholder Derivative Litigation,* (Superior Court of California - Orange County 2006) (Liaison Counsel); *In re Quest Software Shareholder Derivative Litigation,* (Superior Court of California – 2006) (Liaison Counsel); *In re Dot Hills Shareholder Derivative Litigation,* (Superior Court of California - San Diego County 2006) (Liaison Counsel); *In re Samina Corp Shareholder Derivative Litigation,* (California 2006); *In re Viacom Shareholder Derivative Litigation* (Supreme Court New York, New York County  Index No. 602526/05) (Liaison Counsel); *In re Taser International Shareholder Derivative Litigation* (D. Arizona 2005); *In re Marsh McClennann Companies Shareholder Derivative Litigation* (S.D.N.Y. 2004); *In re Wireless Facilities, Inc. Shareholder Derivative Litigation* (S.D. California 2004); *In re Regeneron Shareholder Derivative Litigation* (State Court New York, Westchester County) (Liaison Counsel); and *In re NBTY Shareholder Derivative Litigation* (New York State Court 2004) (Liaison Counsel).

The firm also served as lead or co-lead in the settled matters of *In re Kindred Shareholder Derivative Litigation* Kentucky State Court (Jefferson Circuit Court, Division 13 2002); *In re Sagent Shareholder Derivative Litigation*, 02-0709 (PJH) (N.D. California 2002); *In re Genta Shareholder Derivative Litigation*, (U.S.D.C. D. NJ 04-3169), and was on the Executive Committee of the *In re Williams Companies Shareholder Derivative Litigation* (Okla. District Court, Tulsa County).  It also played an active role assisting lead counsel in settling *In re Charter Communications, Inc. Shareholder Derivative Litigation,* No. 022-10625 (Circuit Court, City of St. Louis, State of Missouri, 2002) and was local counsel in the state court proceeding of the settling matter of *In re Systemax Shareholder Derivative Litigation* (New York Supreme Court, New York, Index No. 05-8835).

Brodsky & Smith, LLC represents numerous investors in the various class action complaints in the *In re IPO Securities Litigation* (2001) pending in the United States District Court of New York. These lawsuits allege violations of securities laws against three hundred and ten issuers and their underwriters involving fraud and conspiracy to artificially inflate the price of initial public offerings in the late 1990's. The firm has assisted lead counsel and its executive committee in several areas including factual investigation, legal research, preparing and revising the amended consolidated complaints, document reviewing and discovery matters. This litigation has settled with the Issuing Company Defendants for an aggregate amount of $1 Billion Dollars, and continues to be prosecuted against all other Defendants including the investment bank Defendants.

The firm also represents several investors in the *In re Mutual Funds Investment Litigation* pending in the United States District Court for the District of Maryland (MDL 1586). This litigation alleges violations of federal securities laws, of the Investment Company Act of 1940 and of ERISA law against approximately 20 different mutual funds for permitting after-market trading over an extended period of time.

Brodsky & Smith, LLC has also assisted lead counsel by performing legal work in *In re Rite Aid Securities Litigation* U.S.D.C. (E.D. Pa.) (1999). This lawsuit settled with many Defendants for the investor class in an amount in excess of Three Hundred Million Dollars ($300,000,000.00). It has also assisted lead counsel by performing legal work in *In re IKON Securities Litigation*, U.S.D.C. E.D. Pa. (1998). This lawsuit was settled with certain Defendants for the investor class in an amount in excess of One Hundred and Ten Million Dollars ($110,000,000.00). Presently, the firm is assisting lead counsel in the *In re Tyco Securities Litigation* matter.

The firm also represents shareholders who file ERISA class action matters against companies for violating their fiduciary duties in administering retirement plans for publicly traded companies. The firm was co-lead counsel in *SPX Corporation ERISA Litigation*, (U.S.D.C. W.D. N.C. 04-cv-192). This matter settled for $3.2 Million for the class. The firm was also co-lead counsel in the settling matter of *Hanover Compressor Company ERISA Litigation* (U.S.D.C. S.D. Texas H-02-0410) which achieved $1,775,000.00 for the class. Brodsky & Smith is currently local counsel in the *In re Loral Space Communications, Ltd. ERISA* litigation pending in the Southern District of New York (03-CV-9729). The firm is also counsel in the *Honeywell ERISA Litigation; Janus Fund ERISA Litigation; Goodyear ERISA Litigation, Polaroid ERISA Litigation, AIG ERISA Litigation and Citigroup ERISA Litigation* matters.

The firm also represents the governmental municipality of Delaware County, Pennsylvania in a municipal bond class action against First Union. This action seeks the return of unclaimed monies from bond issuances over the past thirty (30) years. This case is pending in the Court of Common Please Delaware County No. 01-6882 and has recently been certified as a class action.

# ANTI-TRUST LITIGATION

Brodsky & Smith, LLC represents consumers in various anti-trust matters. The firm is counsel in the following matters: *In re Publication Paper Anti-Trust Litigation* pending in federal court in Connecticut (2004); *In re Elevator Anti-Trust Litigation* (2004) pending in the Southern District of New York; *In re Foundry Resin Anti-Trust Litigation* (2004) currently pending in Ohio; and *In re EPDM Anti-Trust litigation* (2004) currently pending in various states including New Jersey, Florida, Tennessee, Nebraska, New Mexico and North Carolina. Each one of these lawsuits alleges that the Defendants conspired with each other in manipulating prices in order to restrain competition in the market for goods and/or services. This alleged conduct precludes other companies from entering the free trade market and/or inflates prices that would ordinarily have been paid for the goods and/or services and is therefore in violation of Section 1 of the Sherman Act.

The firm is also counsel in anti-trust lawsuits alleging price fixing schemes and/or for filing frivolous applications (and/or extensions) of patents in order to prevent generic drugs from entering the market. These drugs include Alphagryn, Augmentin, Immodium, Neurotin, Remeron and Wellbutrin.

# COMMERCIAL LITIGATION/CONSUMER CLASS ACTION

Brodsky & Smith, LLC is currently Lead Counsel in *The A Million Little Pieces Litigation* pending in the Southern District of New York which alleges consumer fraud against Random House Publishing Company and James Fry, the author of the New York Times Best Seller *A Million Little* Pieces. This matter has been preliminarily approved for a class settlement in the amount of $2.35 Million Dollars. Brodsky & Smith, LLC is currently litigating other putative class matters alleging consumer fraud against publicly traded companies such as Toyota and Federated Department Stores.

Brodsky & Smith, LLC also has represented individuals and businesses in complex commercial litigation with much success. The firm has assisted their clients in litigation matters such as breach of contract, fraud, misrepresentation, tortious interference with contractual relations, insurance disputes, real estate and collection matters.

# CIVIL RIGHTS LITIGATION

Brodsky & Smith, LLC represents disabled individuals and advocacy groups in various litigation matters across the country. This representation includes enforcement of Title III of the Americans with Disabilities Act, 42 U.S.C. Section 12181. Through this representation, our clients attempt to make public accommodations accessible to all disabled individuals. Brodsky & Smith, LLC has achieved both Consent Decrees and settlements on behalf of our clients against *hundreds* of public accommodations around the country. The firm currently is counsel in various putative class action lawsuits attempting to force major corporations across the country to abide by the Americans with Disabilities Act and/or related state statutes.

# PERSONAL INJURY LITIGATION

Brodsky & Smith, LLC has represented, and continues to represent, many individuals in serious personal injury matters. The firm has successfully litigated trial verdicts and has achieved millions of dollars for their clients in cases involving nursing home neglect, vehicular accidents, wrongful death, workman's compensation and premises (slip and fall) accidents.

The firm is proud to have changed the law in Pennsylvania regarding the liability of medical and nursing home facilities when they are found to have violated either the Omnibus Budget Reconciliation Act (OBRA) or the Older Adult Protective Services Act (OAPSA). Specifically, in *McCain v. Beverly Enterprises, Inc.* CV-02-657, Judge Ludwig reversed the prevailing case law in the Eastern District of Pennsylvania, and other jurisdictions, and held that while a private right of action did not exist for plaintiffs against medical facilities for violations of these statutes, plaintiffs were still entitled to bring a claim for damages under a negligence *per se* theory. This holding in essence lowered the burden of proof for injured plaintiffs when the defendants have been held in violation of these statutes by a state or federal agency.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

------------------------------------------------------x

JOSEPH C. HUBBARD, individually and on
behalf of all others similarly situated,

                Plaintiff,

    -v-

BANKATLANTIC BANCORP, INC.,
JAMES A. WHITE, VALERIE C. TOALSON,
JARETT S. LEVAN and ALAN B. LEVAN,

                Defendants.

-------------------------------------------------------- x

**07-61542**

**CIV-LENARD** / TORRES

FILED by ___ D.C.
INTAKE

**OCT 29 2007**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. LAUD.

## CLASS ACTION COMPLAINT

Plaintiff, by his attorneys, on behalf of himself and all others similarly situated, for his

complaint, alleges the following upon personal knowledge as to himself and his acts and as to all

other matters based upon, inter alia, the investigation made by his attorneys, including a review

of public filings of BankAtlantic Bancorp, Inc. ("BankAtlantic" or the "Company"), with the

United States Securities and Exchange Commission ("SEC"), as well as published reports,

conference calls, Company press releases, Internet research, securities analysts' reports and

articles in the news media, and consultation with a forensic accountant..

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of all purchasers of the common stock

(Class A and B shares) of BankAtlantic Bancorp, Inc. ("BankAtlantic" or the "Company")

between November 9, 2005 and October 25, 2007, inclusive, (the "Class Period"). This action is

brought under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act").

2.      BankAtlantic is the holding company for a Florida-chartered bank (BankAtlantic) that offers community banking services to individuals and corporate customers through 93 branch locations in Florida.

3.      Throughout the Class Period, defendants issued false positive statements about the Company's land acquisition and development loan portfolio.  Defendants made numerous claims through press releases and public filings with the SEC that the Company had significantly increased its commercial real estate loan portfolio, but failed to disclose the $27.86 million non-performing loan issued to Steeplechase Properties LLC.

4.      On April 25, 2007, in a partial disclosure, BankAtlantic announced that it would likely suffer an impairment to its loan portfolio because of a non-performing asset. BankAtlantic's stock price declined from a closing price of $10.55 per share to $9.99 per share on July 26, 2007.

5.      Thereafter, on October 25, 2007, after the close of trading, BankAtlantic announced the full truth and extent of its loan losses and real estate impairments.  According to BankAtlantic, non-performing loans increased from $21.8 million on June 30, 2007 to $165.4 million on September 30, 2007, mostly because 11 commercial real estate loans totaling $148.7 million were placed in non-accrual status.  The bank said it was closely monitoring its portfolio of commercial loans. The Company's stock price dropped over 40% on the news.

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  The claims asserted herein arise under

2

Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. Section 78j(b) and Section 78t(a), and Rule 10b-5, 17 C.F.R. Section 240 10b-5, promulgated thereunder by the SEC.

7.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  BankAtlantic lists its principal address as 2100 West Cypress Creek Road, Fort Lauderdale, Florida 33309.

8.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of national securities exchanges.

## THE PARTIES

9.     Plaintiff purchased shares of the common stock of BankAtlantic during the Class Period and was damaged thereby, as set forth in the attached certification.

10.     Defendant BankAtlantic is incorporated under Florida law and maintains its headquarters at 2100 West Cypress Creek Road, Fort Lauderdale, Florida.  BankAtlantic Bancorp operates as the holding company for BankAtlantic, which offers consumer and commercial banking services in Florida.  The Bank's deposit products include commercial demand deposit accounts, retail demand deposit accounts, savings accounts, money market accounts, certificates of deposit, various negotiable order of withdrawal accounts,  individual retirement accounts, and Keogh retirement accounts.  Its lending portfolio comprises commercial real estate loans, commercial business loans standby letters of credit and commitments, consumer loans, small business loans, and residential loans. As of March 8, 2007, the bank offered its services through 93 branches and 200 automated teller machines in southeast Florida and the

Tampa Bay area. The bank conducts business primarily in the Miami-Dade, Broward, Palm Beach, Hillsborough, and Pinellas counties.

11.     Defendant James A. White ("White") served as the Executive Vice President and Chief Fianancial Officer of BankAtlantic until June 30, 2007.

12.     Defendant Valerie C. Toalson ("Toalson") has served as Senior Vice President and Chief Financial Officer of BankAtlantic from February 2006 to January 2007; Executive Vice President and Chief Financial Officer of BankAtlantic as of June 30, 2007.   Toalson signed and certified under Sarbanes-Oxley various SEC filings during the Class Period.

13.     Defendant Jarrett S. Levan ("J. Levan") served as President and Chief Executive Officer of BankAtlantic.

14.     Defendant Alan B. Levan ("A. Levan") has served as Chairman, President, and Chief Executive Officer of BankAtlantic.

15.     The individual defendants, as the senior officers and spokespersons of BankAtlantic, were the controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act and had the power and influence, and exercised the same, to cause the Company to engage in the unlawful conduct complained of herein.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class, consisting of all persons who purchased or otherwise acquired BankAtlantic common stock (Class A and Class B shares) between November 9, 2005 and October 25, 2007 inclusive, and who were damaged thereby.  Excluded from the Class are defendants, members of the immediate family of Defendants and any

4

subsidiary or affiliate of BankAtlantic and the directors, officers and employees of BankAtlantic or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

17.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class located throughout the United States. As of February 12, 2007, BankAtlantic had approximately 56, 221,873 Class A shares of common stock, and approximately 4,876,126 Class B shares of common stock outstanding. Throughout the Class Period, BankAtlantic common stock was actively traded on the New York Stock Exchange National Market (an open and efficient market) under the symbol "BBX." Record owners and other members of the Class may be identified from records maintained by BankAtlantic and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the other members of the Class as well as all members of the Class were similarly affected by defendants' wrongful conduct in violation of the federal law that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experience in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any question s solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

5

        a.      whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

        b.      whether defendants participated in and pursued the scheme and common course of conduct complained of herein;

        c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of BankAtlantic;

        d.      whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of BankAtlantic;

        e.      whether the market price of BankAtlantic common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material mis-representations complained of herein; and

        f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

    21.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

22.     The Class period begins on November 9, 2005. On that date, BankAtlantic filed its 2005 third quarter Form 10-Q with the SEC. This document reported that net income increased to $16,260,000 for the third quarter of 2005, up from $14,691,000 for the third quarter of 2004. It reflected the fact that this earnings increase was, in material part, attributable to the recordation of $3.4 million of income due to a "negative provision for loan losses." The Form 10-Q further stated that the "negative provision for loan losses" was "due to decreased reserves in the commercial loan portfolio reflecting lower loan balances and a payoff of a large hotel loan." As a result, BankAtlantic's allowance for loan losses was 0.89% and of total loans at September 30, 2005 as compared to 1.17% at September 30, 2004.

23.     According to the 2005 third quarter Form 10-Q, the declining trend in the allowance to loan ratio reflected "recent historically low charge-off experience, and a change in the mix of the loan portfolio from commercial to residential loans" as well as a run-off of discontinued loan products.

24.     The 2005 third quarter Form 10-Q was materially false and misleading because it failed to disclose that, on August 8, 2005, in violation of the bank's stated lending policies and the lending standards of the Office of Thrift Supervision ("OTS") and the other federal banking agencies, BankAtlantic granted a $27,860,000 real estate loan to Steeplechase Properties (i) without having obtained an independent appraisal of the real estate, and (ii) either knowing or recklessly failing to know that the collateral underlying this loan was worth no more than $17,100,000.

25.     In addition, the 2005 third quarter Form 10-Q falsely represented the quality of its loan portfolio by representing, through incorporation of the 2004 Form 10-K by reference, that

7

the bank focused its loan production "on collateral based loans" when this was not true.

26.     Defendants either knew or recklessly failed to know of the increased risk of loss arising from their non-compliance with the bank's stated collateral based lending policies and the lending standards of the OTS and the other federal banking agencies, and failed to factor this risk into the bank's loan loss reserves. Thus, defendants either knowingly or recklessly caused BankAtlantic's financial statements for the quarter ended September 30, 2005 to reflect a materially understated loan loss reserve and, consequently, a materially overstated net income.

27.     As a result of the concealment of the above specified material facts and material overstatement of reported net income, the price of BankAtlantic's stock increased upon dissemination of the third quarter Form 10-Q, closing at $14.52 on November 9, 2005 as compared to $14.01 on November 8, 2005.

28.     On March 16, 2006, BankAtlantic filed its 2005 Form 10-K with the SEC. It reported net income of $59,182,000 for the year ended December 31, 2005 as compared to $70,768,000 for the year ended December 31, 2004, and an allowance for loan losses of $41,192,000 and $46,010,000 for the years ended December 31, 2005 and December 31, 2004, respectively. As with prior filings with the SEC, the 2005 Form 10-K represented that the bank focused its loan production "on collateral based loans" stating:

> During 2005, our provision was a recovery due to decreased reserves associated with the commercial loan portfolio reflecting lower loan balances and a payoff of a large hotel loan...Management believes that the allowance for loan losses reflects management's best estimate of incurred credit losses as of the statement of financial condition date. As of December 31, 2005, our allowance for loan losses was $41 million...We periodically analyze our loan portfolio by monitoring the loan mix, credit quality, historical trends and economic conditions. As a consequence, our allowance for loan

losses estimates will change from period to period. A portion of the change in our loan loss estimates during the five year period ended December 31, 2005 resulted from changes in credit policies which focused our loan production on collateral based loans...BankAtlantic evaluates the collectibility of its loan portfolio and provides an allowance for loan losses that it believes is adequate based upon such factors as:

o     the risk characteristics of various classifications of loans;

o     previous loan loss experience;

o     specific loans that have loss potential;

o     delinquency trends;

o     estimated fair value of the collateral;

o     current economic conditions;

o     the views of its regulators; and

o     geographic and industry loan concentrations.

29.     In addition, BankAtlantic's 2005 Form 10-K stated:

At December 31, 2005, BankAtlantic's commercial real estate, construction and development loans, which are concentrated mainly in South Florida, represented approximately 45.2% of its loan portfolio. Accordingly, declines in real estate values, particularly in South Florida, could have a material adverse impact on the credit quality of BankAtlantic's loan portfolio and on its results. Real estate values are affected by various factors, including changes in general and/or regional economic conditions, governmental rules and policies and natural disasters such as hurricanes.

BankAtlantic's commercial real estate loan portfolio includes large lending relationships, including relationships with unaffiliated borrowers involving lending commitments in each case in excess of $30 million. These relationships represented an aggregate outstanding balance of $633 million as of December 31, 2005. Defaults by any of these borrowers could have a material adverse effect on BankAtlantic's results.

9

30. The 2005 Form 10-K described the methodology by which BankAtlantic
computed loan loss reserves as follows:

The calculation of our allowance for loan losses consists of three
components. The first component requires us to identify impaired
loans based on management classification and, if necessary, assign a
valuation allowance to the impaired loans. These Valuation
allowances are established using management estimates of the fair
value of collateral and based on valuation models that present value
estimated expected future cash flows. valuations are based on
available information and require estimates and subjective judgments
about fair values of the collateral or expected future cash flows. Most
of our loans do not have an observable market price and an estimate
of the collection of contractual cash flows is based on the judgment
of management. It is likely that we would obtain materially different
results if different assumptions or conditions were to prevail. This
would include updated information that came to management's
attention about the loans or a change in the current economic
environment. As a consequence of the estimates and assumptions
required to calculate the first component of our allowance for loan
losses, a change in these highly uncertain estimates could have a
materially favorable or unfavorable impact on our financial condition
and results of operations.

The second component of the allowance requires us to group loans
that have similar credit risk characteristics so as to form a basis for
predicting losses based on loss percentages and delinquency trends as
it relates to the group. Management assigns an allowance to these
groups of loans by utilizing data such as historical loss experiences,
loan-to-value ratios, concentration of credit risk, and delinquency
trends. Management uses significant judgment to qualitatively adjust
the historical loss experiences for current trends that existed at period
end that were not reflected in the calculated historical loss ratios. A
subsequent change in data trends may result in material changes in
this component of the allowance from period to period.

The third component of the allowance is the unassigned portion of the
allowance. This component addresses certain industry and geographic
concentrations, the view of regulators, model imprecision, change in
underwriting standards and changes in the composition of the loan
portfolio. This component requires substantial management judgment

10

in adjusting the allowance for the changes in the current economic climate compared to the economic environment that existed historically. Due to the subjectivity involved in the determination of the unassigned portion of the allowance, the relationship of the unassigned component to the total allowance may fluctuate substantially from period to period.

31.    The 2005 Form 10-K was materially false and misleading because it failed to disclose that, on August 8, 2005, in violation of the bank's stated lending policies and the lending standards of the OTS and the other federal banking agencies, BankAtlantic granted a $27,860,000 real estate loan to Steeplechase Properties (i) without having obtained an independent appraisal of the real estate, and (ii) either knowing or recklessly failing to know that the collateral underlying this loan was worth no more than $17,100,000.

32.    In addition, the 2005 Form 10-K falsely represented the quality of the bank's loan portfolio by failing to classify the $27,860,000 as an impaired loan, and by stating that the bank focused its loan production "on collateral based loans" when this was not true.

33.    Defendants either knew or recklessly failed to know of the increased risk of loss arising from their non-compliance with the bank's stated collateral based lending policies and the lending standards of the OTS and the other federal banking agencies, and failed to factor this risk into the bank's loan loss reserves. Thus, defendants either knowingly or recklessly caused BankAtlantic's financial statements for the year ended December 31, 2005 to reflect a materially understated loan loss reserve and a materially overstated net income.

34.    On March 23, 2006, the HeraldTribune.com published an article entitled "The consummate flippers" which disclosed an FBI investigation into the dealings of Neil Mohomed Husani ("Husani") and his associates. The article stated in relevant part:

11

SARASOTA -- Neil Mohamed Husani created a stir in Southwest Florida's real estate community when he got a $16.25 million loan from Fifth Third Bank on property whose value apparently more than doubled in a day.

Now it appears that the appraisal that Husani and his partners used to get bank financing for what is the proposed site of a $125 million condominium tower contains "wrong and misleading information," according to two experts who reviewed the document for the Herald-Tribune.

A deed filed just this month by Husani on another deal overstated the purchase price of some Manatee County property by 250 percent and was used by one of his partners to get a $4.06 million loan from First State Bank in Sarasota.

It's not clear who provided the erroneous sales information in either case.

But filing incorrect or misleading information in an appraisal and using it to obtain a bank loan could constitute bank fraud and subject both the appraiser and the borrower to civil lawsuits and federal and state criminal charges, said Alan Tannenbaum, a well-known Sarasota real estate attorney.

Overstating the price of property in court records is not a crime in and of itself, he said. But if the overstatement is part of a scheme to defraud a bank, it would be considered illegal.

***** 

Another of Husani's partners, Michael Tringali, said he did nothing wrong.

I'm a respectable businessman, he said, adding that the deals he did with Husani are nothing out of the ordinary for a developer. The loans are performing well and the banks are happy, he said.

Since January 2005, Tringali has participated in five multi-million dollar deals with Husani, including the downtown Sarasota condo project.

In those five deals, Husani bought 1,864 acres of land for $34 million,

12

then sold it to limited liability companies involving Tringali for $96 million and those companies accumulated nearly $71 million in bank loans.

The loans were made by Fort Lauderdale's BankAtlantic, Clearwater-based Mercantile Bank, Naples-based Orion Bank, Bradenton-based Coast Bank of Florida and Cincinnati-based Fifth Third.

Several of the deals were valued by the same appraiser, Julian Stokes of Integra Realty Resources-Southwest Florida, who maintains that his appraisals are valid.

*****

When Husani bought land in downtown Sarasota opposite the Sarasota Quay, he used much the same strategy that he brought to bear in his other transactions with Martin or Tringali around Southwest Florida.

He bought the land through a company called Capital Force from three owners for $10.35 million. He then sold the property to Sarasota Grand Central, a limited liability company controlled by himself, Martin and Tringali.

The transaction was valued at $24.6 million, but, according to Martin, no cash changed hands.

We have no money in the deal right now," Martin said in reference to himself and Tringali during an interview last month.

Husani, however, contributed $4 million to the project -- money left over from the $16.25 million Fifth Third Bank loan after Husani paid $10.35 million to the original property owners

*****

Stokes, the appraiser from Integra Realty, used the $24.6 million figure as a basis for the appraisal he conducted for Fifth Third Bank.

The problem with his appraisal is that it states that the property was bought from each of the three original land owners for a total of $24.6 million.
That's not true.

13

Property records show that the three owners were paid $10.35 million.

The data appears to be in error relative to the historical sales as indicated in the Sarasota County court records," said Richard Bass, a Sarasota appraiser who reviewed a summary of the appraisal. If these are as they appear to be -- in error -- the appraisal is grossly misleading.

*****

When it came to Tringali, however, Stokes first said that he knew him, then retracted that statement and finally acknowledged that he had done appraisals involving Tringali's company, G&T Land Development.

Those G&T Development deals, we did those, Stokes said.

In particular, Stokes said he appraised property on Fruitville Road that Husani bought for $4.2 million and sold to G&T for $11.2 million. Tringali then got a $7.28 million loan from Clearwater-based Mercantile Bank.

There were hellacious prices for that property," Stokes said. "But you need to understand what was behind the appraisals. There were underlying circumstances related to changes in use.

Other appraisers who looked at the appraisal Stokes prepared for Fifth Third expressed concern about his methods.

An appraiser is supposed to state and analyze every sale of property within the last three years," said Jim Todora, Sarasota County's elected property appraiser. "Capital Force had two transactions in the same day and they should have been analyzed.

Other appraisers said the appraisal ignores the value of surrounding property.

The highest valued sale in that part of Sarasota came to $386 per square foot, according to Stokes's appraisal. Husani's $24.6 million deal, however, came to $495 per square foot.

That's the highest sale I've ever seen, Bass said.

14

In a separate deal that closed earlier this month, Husani's company, Capital Force, bought a 224-acre ranch in Manatee County from Lakeland-based Quality Petroleum Corp.

Quality's chairman, Ralph W. Weeks, said he was paid $2.25 million for the land.

We sold it for $10,000 an acre, Weeks said.

Husani's attorney, John A. Yanchek, recorded the purchase price as $5.6 million with the Manatee County Clerk of Court.

Husani then sold the property on the same day to The Beacon Co., a limited liability company controlled by Martin, for $6.7 million, and Beacon obtained a $4.06 million loan from First State Bank...Martin did confirm, however, that his $6.7 million purchase of the same land from Husani was a cashless transaction.

35.     Husani left the United States in March 2006, after the FBI began investigating the presentation of false documents to at least one bank that lent Tringali money. (December 3, 2006 HeraldTribune.com)

36.     Defendants either knew or recklessly failed to know of the FBI investigation and the Husani/Tringali land-flipping false-appraisal scheme by no later than March 23, 2006, and either knowingly or recklessly blinded themselves to the collateral shortfall, and thus the potential loss, associated with the bank's $27.86 million loan to Tringali.

37.     On April 17, 2006, BankAtlantic filed a Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, as Amended, which disclosed that "BankAtlantic's management incentive program is designed to motivate executives by recognizing and rewarding performance. The annual incentive program is a bonus plan used to compensate executives generally based on the Company's profitability and the achievement of individual performance

15

competencies and goals. Generally, a minimum corporate profitability threshold must be achieved before any bonus will be paid." It indicated that, for the year ended December 31, 2005, defendants A. Levan and White received a bonus of $621,110.00 and $207,596, respectively.

38.    The bonuses were, in significant part attributable to the material overstatement of 2005 income as alleged above.

39.    On April 26, 2006, BankAtlantic issued a press release announcing financial results for the 2006 first quarter. The press release reported that net income was $6.7 million, or $0.11 per diluted share, compared to $19.9 million, or $0.31 per diluted share, reported in the first quarter of 2005. It quoted defendant A. Levan as stating:

> Credit quality remained strong, with the ratio of non-performing loans to total loans at 0.14% at March 31, 2006. During the quarter, BankAtlantic recorded net recoveries of $534,000, continuing the pattern of the past several quarters. Provision expense was $163,000 compared to a negative provision of $109,000 in the quarter ended December 31, 2005 and a negative provision of $3.9 million in the corresponding quarter of 2005. The ratio of the allowance for loan losses to non-performing loans remained solid, closing the quarter at 687% compared to 606% at December 31, 2005, and 662% at March 31, 2005.

40.    On May 10, 2006, BankAtlantic filed its 2006 first quarter Form 10-Q with the SEC. This document reported substantially the same financial data that was reported in the April 26, 2006 press release. It described the following method by which the bank established loan loss reserves, which was materially different from the method previously used by the bank, as described in the 2005 Form 10-K:

> present value of expected future cash flows, (2) fair value of collateral less costs to sell, or (3) observable market price. Non-homogenous

loans that are not impaired are assigned an allowance based on common characteristics with homogenous loans.

The second component of the allowance is for "homogenous loans" in which groups of loans with common characteristics are evaluated to estimate the inherent losses in the portfolio. Homogenous loans have certain characteristics that are common to the entire portfolio so as to form a basis for predicting losses as it relates to the group. Management segregates homogenous loans into groups such as residential real estate, small business mortgage, small business non-mortgage, low-balance commercial loans and various types of consumer loans. The allowance for homogenous loans has a quantitative amount and a qualitative amount. The methodology for the quantitative component is based on a three year charge-off history by loan type adjusted by an expected recovery rate. A three year period was considered a reasonable time frame to track a loan's performance from the event of loss through the recovery period. The methodology for the qualitative component is determined by considering the following factors:

o Delinquency and charge-off levels and trends;

o Problem loans and non-accrual levels and trends;

o Lending policy and underwriting procedures;

o Lending management and staff;

o Nature and volume of portfolio;

o Economic and business conditions;

o Concentration of credit;

o Quality of loan review system; and

o External factors

Based on an analysis of the above factors a qualitative dollar amount is assigned to each homogenous loan product. These dollar amounts are adjusted, if necessary, at period end based on directional adjustments by each category.

17

The unassigned component that was part of the Company's allowance for loan losses in prior periods was calculated based on the entire loan portfolio considering the above factors and was incorporated into the qualitative components of homogenous loans described above.

41.     The changed methodology, in part, served to enable BankAtlantic to report a materially understated loan loss reserve; a reserve that was only minimally higher than the amount which was reported as of year end 2005.

42.     The 2006 first quarter Form 10-Q was materially false and misleading because it failed to disclose that:

    a.    On August 8, 2005, in violation of the bank's stated lending policies and the lending standards of the Office of Thrift Supervision and the other federal banking agencies, BankAtlantic granted a $27.86 million real estate loan to Steeplechase Properties (i) without having obtained an independent appraisal of the real estate, and (ii) either knowing or recklessly failing to know that the collateral underlying this loan was worth no more than $17.1 million.

    b.    The related parties who were associated with the loan had flipped the property between themselves in order to artificially inflate the sales price, and then obtained a false appraisal to justify the inflated sales price.

    c.    The FBI had been investigating one of the related parties who were associated with the loan, and this individual fled the country.

    d.    Impaired loans were understated by no less than $27,860,000.

43.     In addition, the 2006 first quarter Form 10-Q, by incorporating the 2005 Form 10-K by reference, falsely represented that the bank focused its loan production "on collateral based loans" when this was not true.

44.     Defendants either knew or recklessly failed to know of the increased risk of loss arising from their non-compliance with the bank's stated collateral based lending policies and the lending standards of the OTS and the other federal banking agencies, and failed to factor this risk

into the bank's loan loss reserves. Thus, defendants either knowingly or recklessly caused BankAtlantic's financial statements for the quarter ended March 31, 2006 to reflect a materially understated loan loss reserve and a materially overstated net income.

45.     On July 19, 2006, BankAtlantic issued a press release announcing financial results for the 2006 second quarter. For the three-month period ending June 30, 2006, the bank reported that net income was $8.4 million, or $0.13 per diluted share, compared to $24.5 million, or $0.38 per diluted share, reported in the second quarter of 2005.

46.     On August 9, 2006, BankAtlantic filed its 2006 second quarter Form 10-Q with the SEC. This document reported substantially the same financial data that was reported in the July 19, 2006 press release, and substantially the same description of the bank's revised methodology for computing loan loss reserves that appeared in the 2006 first quarter Form 10-Q.

47.     The 2006 second quarter Form 10-Q was materially false and misleading for substantially the same reasons that the 2006 first quarter Form 10-Q was materially false and misleading.

48.     On October 18, 2006, BankAtlantic issued a press release announcing financial results for the 2006 third quarter. For the three-month period ending September 30, 2006, the bank reported that net income was $2.3 million, or $0.04 per diluted share, compared to $16.3 million, or $0.26 per diluted share, for the third quarter of 2005.

49.     The October 18, 2006 press release quoted defendant A. Levan as stating:

> Credit quality remained good in the third quarter, with the ratio of non-performing loans to total loans increasing only slightly from 0.12% at June 30, 2006 to 0.13% at September 30, 2006, and the ratio of non-performing assets to total loans plus other assets remaining stable at 0.17%. The Bank recorded a net recovery of $234,000 in the

third quarter compared to a net recovery of $143,000 for the immediately preceding quarter. Year-to-date, the Bank has experienced net recoveries of $911,000. The Allowance for Loan Losses increased slightly from $42.0 million at June 30, 2006 to $42.5 million at September 30, 2006, and the ratio of the allowance to non-performing loans at quarter end was 674%.

50.     On October 18, 2006, BankAtlantic issued a press release and filed its Form 8-K for the three month period ended September 30, 2006. In the press release, A. Levan, Chairman and CEO of BankAtlantic Bancorp stated: "For the third quarter 2006, BankAtlantic's net income was $9.7 million, down from $19.3 million in the comparable 2005 quarter. The third quarter 2005 included a negative provision for loan losses of $3.4 million, compared to a $271.000 provision in the current quarter, contibuting significantly to the earnings decline."

51.     According to a December 14, 2006 news article published by the *Herald Tribune* at http://www.heraldtribune.com/, the caption read "Failed loan by ex-Husani partner threatens one bank's bottom line" records on file with the Sarasota County Clerk of Courts, Manatee County, the Sarasota County Property Appraiser, and the Manatee County Property Appraiser indicate that:

a.     On June 16, 2005, The Eddy Corp. sold a 1,143 acre sod farm (vacant land) to Rusty Pot LLC for $7.78 million.

b.     By July 28, 2005 Peter J. Shirk and his partners had sold Rusty Pot LLC to Neil Mohamad Husani's company, Capital Force, for $17.1 million.

c.     On August 8, 2005, Rusty Pot LLC sold the 1,143 acre sod farm to Michael Tringali's company, Steeplechase Properties LLC, for $34.2 million.

d.     On August 8, 2005, Steeplechase Properties obtained a $27.86 million loan from BankAtlantic.

e.     After Husani's purchase of the vacant land, nothing was done to

substantially enhance its value.

52.  Michael Tringali defaulted on the $27.86 million loan and, on September 30, 2006, BankAtlantic classified the loan as a non-performing asset. Discussing this loan, BankAtlantic's 2006 third quarter Form 10-Q, filed on November 8, 2006, stated:

> The increase in non-performing assets primarily resulted from the transfer of a $26.6 million land acquisition and development loan to a non-accruing status effective September 30, 2006 based on information that existed prior to September 30, 2006 and became available to BankAtlantic subsequent to that date. Among other issues, BankAtlantic has been advised by the borrower that contracts for sales of land parcels were terminated by third party buyers. BankAtlantic has requested an appraisal to measure the loan impairment based on the fair value of the collateral. To date, the appraisal has not been received and the amount of the required specific reserve, if any, has not been determined.

53.  The foregoing was materially false and misleading because, as discussed below, defendants knew and ignored or recklessly failed to know that the vacant land was clearly worth no more than $17.1 million and, accordingly, that a charge to earnings of no less than $10.4 million was required as of September 30, 2006. The $10.4 million figure is computed as follows:

| | |
|---|---|
| Loan balance at 9/30/06 | $26.6 million |
| Sales price at 7/28/05 | 17.1 million |
| Subtotal | $ 9.5 million |
| Cost to sell (5% sales commission) | .9 million |
| Total | $ 10.4 million |

54.  Defendants did not recognize the $10.4 million loss as of September 30, 2006 when all of the facts then existing indicated that the loss was no less than this amount. Defendants knew and recklessly ignored or recklessly failed to know that the vacant land was flipped between related parties in order to arrive at a grossly inflated value, and that the appraisal that was presented to them to justify this value was grossly inflated.

21

55.     BankAtlantic ignored readily available comparable sales data that would have served as a yardstick by which to measure the bank's loss, and a March 23, 2006 *Herald Tribune* Internet news article which revealed Husani's criminal activities and described Husani and his coterie as "the consummate flippers."

56.     According to the Company's 2006 third quarter Form 10-Q as filed with the SEC on November 8, 2006, BankAtlantic justified their deferral of the recognition of losses by claiming that they were awaiting the results of an appraisal: "BankAtlantic has requested an appraisal to measure the loan impairment based on the fair value of the collateral. To date, the appraisal has not been received and the amount of the required specific reserve, if any, has not been determined."

57.     On December 8, 2006, the *South Florida Business Journal* published an article titled "Mystery loan's ID unraveled." It reported that approximately two weeks after the 2006 third quarter Form 10-K had been filed, Steeplechase Properties LLC deeded the vacant land to BankAtlantic's subsidiary (Heartwood 7 LLC) in full satisfaction of the loan. By that time BankAtlantic had obtained an appraisal which, according to Defendant A. Levan, was "approximately the same amount as the loan."

58.     On December 15, 2006, the *Herald Tribune* published an article ("Lender's strategy on failed loan scrutinized") which stated:

> For months, Southwest Florida's real estate community has been asking how Neil Mohamad Husani and his former partner, Michael Tringali, were able to buy properties for one price, get them appraised for more than twice as much a day or so later, and then use the high values to get whopping loans from area banks.
>
> Now that some of those loans are going bad, the new question on

22

their minds is how one of the lenders, Fort Lauderdale-based BankAtlantic Bancorp, was able to get a property it bought from him appraised at a similarly high value and avoid taking losses that could besmirch its balance sheet.

Tringali defaulted on a $27.9 million loan to BankAtlantic several months ago. But rather than foreclosing, one of BankAtlantic's subsidiaries bought Tringali's 1,143-acre property near Myakka City for $27.2 million, Manatee County court records show.

Alan Levan, BankAtlantic's chief executive, has said that the property was recently appraised again at about $28 million. That valuation is significant because it allows BankAtlantic to say that it broke even on its loan to Tringali. That means the bank might not have to book losses or set aside loan loss reserves. Local real estate experts say that the recent $28 million appraisal is not realistic. They point instead to the price that Husani first paid for the property in summer 2005, before its cashless transfer to Tringali.

How can that be a legitimate number? asked Barbara Anson, a Wagner Realty agent who has been selling land in the Myakka City area for 30 years. "The legal and market value must be around $17 or $18 million. That's what it's worth." Levan has not returned a series of calls from the Herald-Tribune for comment about the loan and property sale. Requests to talk to anyone else at the bank -- the second largest Florida-based bank -- also were declined. (http://www.heraldtribune.com/)

59. Defendant A. Levan's statement specified the December 8, 2006 *South Florida Business Journal* article was materially false and misleading because it:

   a. Led the investment community to believe that the acquired vacant land was worth approximately $27 million.

   b. Concealed the fact that BankAtlantic had justified the acquisition price by obtaining a false appraisal.

60. In a January 31, 2007 press release, BankAtlantic announced the recognition of a $7 million loss provision on the real estate. This press release stated that the $7 million reflected the value of the vacant land, less estimated costs to sell it:

During the fourth quarter 2006, **the Bank took possession of the real estate securing the $27.2 million non-performing loan disclosed in the Company's third quarter Form 10-Q filing. The loan was charged down by $7.0 million to its collateral value less costs to sell** and transferred to Real Estate Owned (REO) with a corresponding increase in the provision for loan losses of the same amount.

61.     In view of Defendant A. Levan's statement concerning the appraised value of the vacant land, by inference, BankAtlantic's press release represented that it would cost $7 million to sell the million parcel of vacant land which was otherwise worth $27,200,000. This representation was materially false and misleading.

62.     On the following day, February 1, 2007, BankAtlantic held an earnings conference call. During this call, Defendant White presented a new explanation for the $7 million charge to earnings. He stated that this charge included "the cost to complete the development" which he stated was (as of February 1, 2007) "largely complete":

We obtained an appraisal in the fourth quarter and charged that down to about $20 million which is what we believe the net realizable value including the cost to complete the development. The development is largely complete.

63.     This statement was materially false and misleading because, as later admitted during the conference call, the property was comprised of vacant land and, accordingly, "development" was not "largely complete."

64.     During this conference call, Defendant J. Levan described the process by which the vacant land appraisal was performed as follows: "when you appraise a property for liquidation, the appraiser goes through a process of an assumed absorption, an assumed sale at which, my guess is several years in order to liquidate the property, and then you bring it back to

24

current value."

65.    Thus, the process by which Defendants arrived at their inflated appraised value was revealed. Rather than obtaining a current market price for the property (an "as is" appraisal), they assumed a certain sales price several years in the future and then discounted this assumed sales price to the current date.

66.    Appraisal Standards for Federally Related Transactions issued by the Board of Governors of the Federal Reserve System (the "Board") under title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA")    (Pub. L. No. 101--73, 103 Stat. 183 (1989)), 12 U.S.C. 3310, 3331--3351, and section 5(b) of the Bank Holding Company Act, 12 U.S.C. 1844(b) defines an appraisal as "a written statement independently and impartially prepared by a qualified appraiser setting forth an opinion as to the **market value** of an adequately described property as of a specific date(s), supported by the presentation and analysis of relevant market information."  It further states that:

> Market value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. **Implicit in this definition is the consummation of a sale as of a specified date** and the passing of title from seller to buyer under conditions whereby:
>
> (1)    Buyer and seller are typically motivated;
>
> (2)    Both parties are well informed or well advised, and acting in what they consider their own best interests;
>
> (3)    A reasonable time is allowed for exposure in the open market;
>
> (4)    Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

(5)    The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

67.    The appraisal obtained by BankAtlantic did comply with the foregoing.

68.    On April 25, 2007, BankAtlantic issued a press release which stated that the bank experienced an increase in non-accrual loans in its residential real estate development portfolio during the quarter, and that it expected further deterioration in the portfolio during 2007. This press release stated in relevant part:

> During the first quarter of 2007, non-accrual loans increased $19.6 million from the first quarter of 2006, the majority of which related to residential land acquisition and development loans in our commercial real estate loan portfolio. As a result, the ratio of non-performing loans to total loans increased from 0.14% at March 31, 2006 to 0.55% at March 31, 2007. The provision for loan losses in the first quarter of 2007 was $7.5 million, or 0.64% of average loans (annualized) versus $0.2 million, or 0.01% for the first quarter of 2006. The allowance for loan losses increased $8.5 million from $41.9 million (0.94% of total loans) at March 31, 2006 to $50.4 million (1.08% of total loans) at March 31, 2007; and the ratio of allowance for loan losses to non-performing loans stood at 196% at March 31, 2007. **The current environment for residential land acquisition and development loans is a concern, particularly in Florida, and represents an area where we remain very cautious in our credit management. In view of market conditions, we anticipate we may experience further deterioration in the portfolio over the next several quarters as the market attempts to absorb an oversupply of available lot inventory.**

69.    On the following day, April 26, 2007, BankAtlantic held an earnings conference call. During this call, Defendant White noted that non-accrual assets went up to $49 million, stating: "We expect this is going to be a tough year for residential land development." Defendant A. Levan echoed this sentiment by acknowledging that "in Florida...the homebuilding industry is pretty ugly" with new homes "selling at reduced margins to eliminate unsold inventory of

26

houses" and that, "our best guess is that in a year, year and a half, the homebuilders are going to start to be looking for opportunities to buy land again; either the land they've already contracted for that they've extended, or pricing will have been reduced in land, and they will start to come back into the market."

70.　In response to a question concerning the adequacy of loss reserves, Defendant Valerie Toalson (a CPA and the Company's CFO) stated that of the $7.5 million reserve which was established during the quarter, $5.7 was related to "one of the specific non-accruals that we put on this quarter", and that the remaining $1.8 million applied to the remainder of the bank's portfolio.

71.　Defendant A. Levan justified the bank's $7.5 million reserve, $5.7 of which was a specific reserve applied to one loan, by stating:

> ...the loan-to-values give us a reasonable margin for value reductions, so that we will still be okay in our portfolio...We're talking about the loan-to-value. And this, of course, is the loan-to-value at the time the loan was made in the underwriting. The issue that all land is going through, all homebuilders are going through, and all new houses are going through, is reduction in pricing. And so, the phenomenon that is going on today, in Florida and nationally, is that the reason for the -- the reason that there's a slowdown is that houses aren't selling. In many cases, the reason they're not selling is because they're overpriced...Now when we do our valuations -- for purposes of whether we need to reserve or do charge-offs, or et cetera -- we're constantly looking to see what the current valuation is of these -- of the collateral in our portfolios. And to the extent that we see reductions in value, when we know it, if it impacts our loan or impairs our loan, then we're going to report it accordingly.
>
> **So the answer I gave you as relates to value, of course, was the original value. But to the extent that the market is slow, and there may be some devaluation going on -- which is very difficult to determine, because there's not a lot of sales going on.** There's not a lot of home sales going on, and there's not a lot of land portfolios

that are being sold anymore to the national homebuilders. Everybody's just looking for extensions, waiting for the market to get better. **So we haven't seen any increase in value. But we haven't seen substantial decrease in value. It's just kind of staying at the same level.** And that's why we're watching it so carefully and are concerned about it.

72.     In other words, Defendant A. Levan stated that because there was an no market for vacant land, the bank had no proof of increases or decreases in value. Therefore, the bank assumed that the loan-to-value at the inception of the loan had not changed and, accordingly there was no impairment. This was a partial revelation of the truth that BankAtlantic was treating its entire land loan portfolio in the same manner as it treated the Steeplechase Properties land loan. Defendants were knowingly or recklessly blinding themselves to the collateral shortfalls associated with non-accrual loans and improperly deferring the recognition of losses. On this partial disclosure, the price of BankAtlantic's stock dropped from a closing price of $10.55 on April 25, 2007 to a closing price of $9.99 on April 26, 2007 in heavy trading.

73.     On July 24, 2007 BankAtlantic issued a press release discussing its financial results for the second quarter of 2007. In the release BankAtlantic's Chairman A. Levan, stated: "While we remain committed to the expansion of BankAtlantic through organic growth, we understand that we are in a very challenging economic cycle. This quarter's financial results compared to the prior year reflect growth in deposit accounts, continued opening of new stores, and **our focus on operational efficiency**. However, it also reflects the significant impact of the economic cycle on our business with margin compression, **higher non-performing asset levels and an increase in our loan loss reserves.**" Levan continues in the press release to state:

Commercial Loans - The Bank's Commercial Real

28

Estate loan portfolio at June 30, 2007 totaled $1.4 billion. This portfolio consists of retail, industrial, residential construction and development loans. Most of these loans are personally guaranteed, BankAtlantic's interest in any of these loans generally does not exceed $20.0 million, and single borrower concentrations are limited to $40.0 million. Approximately twelve loans in this portfolio, aggregating approximately $135 million, are characterized as 'Builder Land Loans'. 'Builder Land Loans' were made to borrowers who have agreements to sell the underlying collateral to national and local home builders pursuant to option contracts. However, due to the deterioration in the Florida housing market, some of these option contracts have been cancelled or modified. We continue to monitor the impact of the weak homebuilding environment on this portfolio. Although our non-accrual loans declined $3.9 million in the quarter from the first quarter of 2007, we may have additional downgrades and additional provisions relating to the portfolio if the housing market does not improve.

74. This statement was materially vague and misleading due to BankAtlantic's failure to point out that the higher non-performing asset levels and increase loan loss reserves was impacted by the $27.86 million loan in default by Michael Tringali.

75. As discussed above, Husani and Michael Tringali, clients of BankAtlantic, engaged in what is termed as "Title Flips" in order to obtain loans for various banking institutions including BankAtlantic. Husani and Tringali inflated land values, and obtained inflated appraisals for the land at above market value in order to secure bank loans with the assistance of third parties. The loans would cover the original cost of the land and provide additional funds to finance development. Between July 2004 and January 2006, Husani spent $42 million for approximately 1,900 acres of land. This property was sold to Tringali in a non-

29

cash transaction for $98 million. Upon competing this transaction Tringali used the higher purchase prices and accompanying fictitious appraisals to obtain $83 million in loans from seven banks, which included BankAtlantic. Several of the deals were valued by the same appraiser, Julian Stokes (managing director of Integra Realty Resources' Southwest Florida operations) and each of the seven banks sustained losses including BankAtantic.

## THE FULL TRUTH IS REVEALED

76.    On October 25, 2007, after the close of the market, BankAtlantic issued a press release revealing the full extent of the impairment, reporting its financial results for the third quarter ended September 30, 2007. It announced a net loss of $29.6 million, or $0.52 per diluted share compared to net income of $2.5 million, or $0.04 per diluted share, for the third quarter of 2006. The net loss for the nine months of 2007 was $12.3 million or $0.21 per diluted share, compared to net income of $17.1 million or $0.27 per diluted share for the comparable 2006 period. A. Levan commented in the press release:

> This quarter's financial results reflect the continuing impact of the current economic environment on our business, particularly the deteriorating residential real estate market, contributing to higher non-performing asset levels, increased loan loss reserves, further valuation impairment of real estate owned and held for sale, and net margin compression. The impact of the decline in the Florida residential real estate market has been significant. We do not anticipate that market conditions will improve in the near-term and expect that the negative factors impacting this quarter's results may continue to affect us in the fourth quarter and into 2008.

77.    The Company's stock price dropped from an opening price of $7.45 to a closing price of $4.72, on heavy volume: 7,949,400 shares.

## NO SAFE HARBOR

78.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint. None of the allegedly false and misleading statements pleaded herein was a forward looking statement nor were any statements identified as "forward-looking statements" when made. To the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements because at the time, each of those forward-looking statements was false or misleading and/or the forward-looking statement was authorized or approved by an BankAtlantic executive officer who knew that these statements were false or misleading when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

79.     At all relevant times, the market for BankAtlantic common stock was an efficient market following reasons, among others:

a.      BankAtlantic common stock met the requirements for listing, and was listed and actively traded, on the New York Stock Exchange (Ticker: "BBX"), a highly efficient market;

b.      BankAtlantic common stock was heavily traded during the Class Period, with average daily trading volumes of between approximately 705,268 shares based on a three-month average.

c.      As a result, the market for BankAtlantic securities promptly digested current information with respect to BankAtlantic from all publicly-available sources and

31

reflected such information in BankAtlantic stock price. Under these circumstances, all purchasers of BankAtlantic common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## SCIENTER ALLEGATIONS

80.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding BankAtlantic and its business practices, their control over and/or receipt of BankAtlantic allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning BankAtlantic were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and /or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning the Company's business, finances and operations. The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Defendants James A. White, Valerie C. Toalson, Jarett S. Levan, and Alan B.

Levan.

## LOSS CAUSATION

81.     Defendants' false statements artificially inflated the price of BankAtlantic stock. When the truth was revealed (partially and then fully) and investors learned that BankAtlantic would suffer heavy loan losses, the price of BankAtlantic stock declined by over 40 %.

## FIRST CLAIM

### Against All Defendants for Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder

82.     Plaintiff repeats and realleges each and every allegation contained above.

83.     Each of the defendants: (a) knew or recklessly disregarded material adverse non-public information about BankAtlantic's financial results and then existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representation of and about BankAtlantic.

84.     These defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for BankAtlantic's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued as primary participants in the wrongful and illegal conduct charged herein. These defendants are also sued

33

herein as controlling persons of BankAtlantic, as alleged below.

85.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

86.     Plaintiff's loss on his purchase of the common stock of BankAtlantic was caused by the false and misleading statements of material fact alleged herein.

87.     During the Class Period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     Defendants have violated § 10(b) of the Exchange Act Rule 10b-5(b) promulgated thereunder in that during the Class Period they made untrue statements of material facts or omitted facts  necessary in order to make statements made, not misleading.

89.     Plaintiff and Class have suffered damage in that, in reliance on the integrity of the market.  Plaintiff and the Class would not have purchased BankAtlantic stock had they been

aware of defendants' false and misleading statements.

## SECOND CLAIM

### Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

90.     Plaintiff repeats and realleges each and every allegation contained above.

91.     Defendants James A. White, Valerie C. Toalson, Jarett S. Levan, and Alan B. Levan acted as controlling persons of BankAtlantic within the meaning of Section 20(a) of the Exchange Act. By reason of their senior executive and/or Board positions, and having the power and authority to cause BankAtlantic to engage in the wrongful conduct complained of herein.

92.     By reason of such wrongful conduct, Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of BankAtlantic stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure:

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees: and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 29, 2007.

VIANALE & VIANALE LLP

By: _Kenneth Vianale_

Kenneth J. Vianale
Fla. Bar No. 0169668
Julie Prag Vianale
Fla. Bar No. 0184977
2499 Glades Road, Suite 112
Boca Raton, Florida 33431
Tel: 561-392-4750
Fax: 561-392-4775

**STULL STULL & BRODY**
Jules Brody
6 East 45th Street
New York, New York 10017
Tel.: 212-687-7230
Fax: 212-490-2022

**DAVID CHASE, P.A.**
David R. Chase
1700 East Las Olas Blvd.
Penthouse 2
Fort Lauderdale, FL 33301
Tel.: 954-920-7779
Fax: 954-923-5622

*Attorneys for Plaintiff*

36

Vianale & Vianale LLP
2499 Glades Road, Suite 112
Boca Raton, FL 33431
Tel.: 561-392-4750/Fax: 561-392-4775

David R. Chase, PA
1700 East Las Olas Blvd., Penthouse 2
Fort Lauderdale, FL 33301
Tel: 954-920-7779/Fax: 954-923-5622

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

### Re: BankAtlantic Bancorp Inc. (BBX)

I, Joseph C Hubbard, hereby declare:

1.     I have reviewed a complaint and authorized its filing. I retain the law firm of Vianale & Vianale LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.     I did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     I have made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below: (use a separate sheet if necessary)

| Date | Transaction Type (Buy or Sell) | # of Shares | Price Per Share |
|------|--------------------------------|-------------|-----------------|
| 12/23/2005 | | | |
| 12/23/2005 | Buy | 800 | 400 @ 14.26  400 @ 14.27 |
| 1/8/2006 | Buy | 2000 | 1400 @ 14.84  600 @ 14.85 |
| 1/26/2006 | Buy | 2000 | 13.74 |

5.     During the three years prior to the date of this Certificate, I have sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws:

6.     I will not accept any payment for serving as a representative party on behalf of the class beyond a pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of August, 2007.

Signed: _Joseph C Hubbard_

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

JOSEPH C. HUBBARD, individually and on behalf of all others similarly situated

**Bill Torres**

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Vianale & Vianale LLP
2499 Glades Road, Suite 112
Boca Raton, FL 33431
Tel: 561-392-4750

**CIV - LENARD**

## DEFENDANTS

Bankatlantic Bancorp, Inc., James A. White, Valerie C. Toalson, Jarett S. Levan, and Alan B. Levan

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

**07-61542**

**(d)** Check County Where Action Arose: ☐ MIAMI-DADE ☐ MONROE ☒ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**0:07 CV 61542 - Lenard - Torres**

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | **PERSONAL INJURY** | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Med. Malpractice | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 365 Personal Injury - Product Liability | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | **PERSONAL PROPERTY** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 370 Other Fraud | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 371 Truth in Lending | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 380 Other Personal Property Damage | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 385 Property Damage Product Liability | | | ☐ 950 Constitutionality of State Statutes |
| **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | |
| ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 442 Employment | **Habeas Corpus:** | | | |
| ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 444 Welfare | ☐ 535 Death Penalty | | | |
| ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | |
| ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

**FILED by ___ D.C.**

**INTAKE**

**OCT 29 2007**

**CLARENCE MADDOX**
**CLERK U.S. DIST. CT.**
**S.D. OF FLA. - FT. LAUD.**

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☐ NO     b) Related Cases ☐ YES ☒ NO

JUDGE _____     DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

15 U.S.C. § 78j(b) securities fraud)

LENGTH OF TRIAL via ___ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE 10/29/07

**FOR OFFICE USE ONLY**

AMOUNT 350.00     RECEIPT # _____     IFP _____